Louise **MEYERS**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 67925.

Court of Criminal Appeals of Texas, Panel No. 2.

Nov. 4, 1981.

Douglas M. O'Brien, Houston, court appointed on appeal only, for appellant.

John B. Holmes, Jr., Dist. Atty., Bill Willms and Matthew Leeper, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

Before ODOM, CLINTON and TEAGUE, JJ.

## OPINION

CLINTON, Judge.

Appeal is taken from a conviction for forgery by possessing a forged instrument with intent to utter it, knowing it was forged, upon a plea of guilty; the trial court assessed appellant's punishment at five years confinement in the Texas Department of Corrections. However, there is much more to the case than that, for appellant presents a single ground of error that is more troublesome under the facts of the matter than the bare statement suggests. The ground is:

> "The trial court erred by accepting the appellant's plea of guilty *without fully inquiring* into whether appellant received effective assistance of counsel." [1]

The thrust of the contention advanced by appellant is that where it is made to appear to the trial court that effectiveness of assistance of counsel is being impugned, the prohibition in Article 26.13(b), V.A.C.C.P. that a plea of guilty not be accepted unless it is "free and voluntary" [2] mandates a thorough inquiry by the trial court into the matter. [3] We now examine what was made to appear to the judge of the court.

Appellant, physically restrained by store personnel when the check she had attempted to pass was found to be forged, was arrested under the name of Marie Faye Hill on April 3, 1980, the alleged date of the instant offense, and immediately incarcerated. A written charge of the offense of forgery by possession was lodged April 5, 1980, and included were habitual allegations as well as a notation "No Bond." By letter dated April 15, 1980 and addressed to the judge of the trial court appellant complained that she had not yet entered a courtroom, [4] had not been told of charges against her, needed but did not have an attorney and, meaning no "disrespect," "I need some help." She was indicted, consistently with the charge, April 18, 1980, still "No Bond." April 24, 1980 she executed a pauper's oath, counsel was appointed and the cause set for pretrial hearing May 14, 1980. She made a court appearance on that day, but the cause was reset for the same purpose over to June 26, 1980 because, it seems, the prosecuting attorney and counsel for appellant joined in a motion for and the court ordered a psychiatric examination to determine competency to stand trial and sanity at the time of the offense.

Before the examinations were held, dated May 29, 1980, appellant made a *pro se* written application for a writ of habeas corpus for fixing of reasonable bail; it was forwarded by the clerk of the court to the judge on or about June 5, 1980, but we do not find any action taken.

Meanwhile on June 3, 1980, the Harris County Psychiatric Hospital made its written competency and sanity evaluation report to the court, [5] that seems to have been

---

1. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

2. As pertinent here § 26.13(b) provides, "No plea of guilty . . . shall be accepted by the court unless it appears that . . . the plea is free and voluntary."

3. While out of an abundance of caution the State takes pains to demonstrate that representation actually afforded ultimately was effective, we read the ground of error narrowly and see the authorities discussed by appellant as *indicating* wider "areas" the trial court should have explored. Thus, we do *not* decide whether appellant's trial counsel was effective or not.

4. However, a docket entry indicates a probable cause hearing was set and one was held April 7, resulting in a finding of probable cause.

5. Appellant was found sane, the psychologist noting, "she does not remember any of the facts and circumstances surrounding the present alleged offense because by her own admission she was intoxicated on drugs and alcohol." She was also found competent, the psychologist recounting an earlier examination in December 1978 in connection with one of the alleged prior forgery cases, her conviction, confinement, release and return to Houston and to her old ways of "doping and drinking."

Included in the report are remarks appellant is said to have made about her appointed attorney in the instant case, *viz*:

filed July 10, 1980. The scheduled pretrial hearing came and went, without anything being presented for determination so far as the record shows, and the case was set for trial August 18, 1980.[6]

The State announced ready. An announcement by counsel for appellant is not recorded, but he did file a motion to quash the first alleged enhancement, citing the deficiency found in the indictment by this Court in *Landry v. State*, 583 S.W.2d 620 (Tex.Cr.App.1979).[7] For whatever reason, the case was reset for jury trial August 25, 1980.

With the prospective jurors on the way to the courtroom, and through informal prearrangement, the judge allowed counsel for appellant a "pretrial hearing," which the latter stated was to spread on the record "some information regarding plea bargaining." He then called his client to the stand and, after preliminary matters were covered and he moved into what he had explained to her, came an exchange followed about the nature and quality of their attorney-client relationship. We excerpt pertinent portions in the margin.[8]

It is at once obvious that appellant's attorney was undertaking to protect himself against the very charge of ineffective assistance impliedly suggested now.[9] It is just as clear that, while appellant converted

---

"I saw him once. I told him I needed help but did not tell him why. He asked me if I was trying to plead insanity, I said no. I needed help with my problems, problems with drugs."

The psychologist reports that when questioned about the possible consequences about being found guilty of the forgery offense, appellant stated that "she did not want to answer any more questions," and the interview was then terminated. Among other conclusions reached was that appellant had "sufficient present ability to consult with counsel with a reasonable degree of rational understanding."

6. July 29, 1980, appellant executed an authorization for release of records kept at the Harris County Psychiatric Hospital, particularizing a "discharge summary" predated in February 1978; the authorization is witnessed by a psychologist in the Harris County Sheriff's Department, and shows a copy to the trial judge. The essence of the summary is in its diagnosis: "Hysterical personality disorder," and the observation that "we do expect... [she] ... will continue to be some hostile and demanding." The witnessing psychologist, herself, wrote a letter to the court opining that appellant seems "to have considerable gain in managing her behavior, and appears to be sincere in trying to make something of herself."

7. When motion to quash was later heard by the trial court, the State would agree with counsel's legal theory.

8. "Q: Have I further explained to you that the prosecutor in plea bargaining has agreed to drop one of the cases that is in the indictment against you, the prosecutor has agreed to drop that and recommend to the Court, upon a plea of guilty, that you serve five years in the Texas Department of Corrections; have I explained that you?
A: No.
Q: I haven't explained that to you?

A: No.
Q: You understand that to be the case now?
A: I understand that now, at this moment.
Q: You are telling the Court that I didn't tell you that before today?
A: That's right.
Q: Do you wish to enter that—*do you wish to accept that five years?*
A: I don't want you for my attorney. Like I'm getting railroaded. You see, I don't get no choice.
Q: *Are you telling the Court you wish to refuse the five years in plea bargaining?*
A: You talked to my family over the weekend, you asked for five thousand dollars. You come to Court and tell me you are going to send me on. I did not ask for you.
[DEFENSE]: That is all we have, Your Honor.
[PROSECUTOR]: Also, the offer was made to her she could plead to the Judge and go to the Judge for punishment.
[DEFENSE]:
Q: Do you understand you have an option of letting the Judge rather than a jury try the case?
A: I understand the DA more than you.
Q: Do you understand you have a right to go to the Judge?
A: I don't understand nothing, but I don't want you for a lawyer. I feel like I'm caught up in a corner.
[DEFENSE]: Judge, since I can't get responsive answers, that is all we have."

9. Criminal defense lawyers are constantly informed in continuing legal education programs and skills seminars to make a record of client response to a plea bargain proposition, particularly if the offer is rejected. See, e. g., Bobo, Malpractice Problems for Criminal Law Practitioners, 1 Advanced Criminal Law Course Manual K–11 (State Bar of Texas, July 1979); Moses, Criminal Defense Sourcebook 549.

the occasion into illuminating her grievances against her attorney, she never did reject the proposed plea bargain.[10] Nevertheless the cautious trial judge turned to examine appellant about her relations with counsel and her defensive posture in the case. Omitting only redundant material, we set out their colloquy in the margin.[11]

10. Though appellant denied being previously informed of the proposal by counsel and claimed she was "getting railroaded," one may be permitted some skepticism in the circumstances, especially since in a few minutes she would sign her name to a paper in which it is stated, inter alia, "I am satisfied that the attorney representing me today in court has properly represented me and I have fully discussed this case with him."

11. "Q: You say you have had some difficulty in communicating with the lawyer that the Court has appointed in the case?

A: Very much.

Q: What has been the basis of that, from your standpoint?

A: First, he let me set up in jail for four months and I didn't see him or hear from him. I wrote him. After he do that, my family do come to see me. He asked for five thousand dollars, my family don't got no five thousand dollars.

\* \* \* \* \* \*

Q: He has told you he has gone to your family?

A: No. My family come to him, he told me this with his own mouth over the telephone when I called him Friday, he told me this five thousand dollars—I don't understand that, he is court appointed. If that is the case, my family can get an attorney.

THE COURT: Miss Hill, I don't believe I understand what you are—

A: I don't understand either. I don't understand nothing.

Q: Have you been able to explain to [counsel] some of the defensive issues that you have?

A: I seen this man on the 18th of August and he came in, he say take this and go on and shut up. If you don't, you are going to get a life sentence and that is that. I'm going to get through with you Monday if you don't come up with some money. No, I don't understand anything except that I am in a corner.

Q: Have you given him any facts or witnesses to subpoena in your behalf?

A: The first time I seen this man was August 18, two minutes. [That is the date of the initial setting for jury trial, when counsel filed the motion to quash the first enhancement allegation.]

Q: Did you explain your defense to the charge against you?

A: He say he don't have nary one. He say he don't care what happens to me, he charges ninety dollars an hour, this is all he been telling me.

Q: Did you explain to him that you wanted to enter a plea of not guilty to the charges?

A: Your Honor, I asked this man to help me. These people come before me, asked this man what can he do. Organizations, drug programs, different things he has turned his back on every one of them.

\* \* \* \* \* \*

Q: Every one that has asked him what?

A: Asked—come to him and asked what kind of help he can give. They couldn't get in touch with him. What was he going to do? They can't find him. Everybody keep telling him to help me. They can't find him. When they do tell him something, they come back and tell me they can't get nothing from him.

Q: What witness are we—

A: Talking about Peggy McCoy. I'm talking about a woman from a justice organization, talking about a bunch of people.

Q: You know he can't subpoena a bunch of people unless there is a name on the subpoena?

A: He ain't gave me no chance to tell him nothing. He keep telling me shut up, you have been to the pen before, there is no hope for you and I charge ninety dollars an hour. That ninety dollars an hour would be the position I was in.

Q: You understand there is a jury panel right outside to try your case at this time? You know that [counsel] has filed a Motion to Quash your indictment or quash the enhancement count in the indictment?

A: Yes. I sent it to the Court and gave it to him.

Q: You sent it to the Court and gave it to him?

A: Yes. I know it's supposed to be there. I tried to do something myself. I don't know what I am doing.

Q: You do know that there has been an examination made by the Harris County Psychiatric Hospital?

A: Yes, sir.

Q: And how did you arrange for that, Miss Hill?

A: He ordered it, I guess. I didn't arrange for it. That is what the records said.

Q: You did not confer with him on June 26 of this year?

A: No, sir. [June 26 is the date, upon joint motion, the court ordered psychiatric examinations; a docket entry recites that appellant was present in court with her attorney.]

Q: Before you were examined by the Harris County psychiatrist?

From that dialogue the judge could, and no doubt did, discern that her earlier diagnosed "hostile and demanding" attitude focused more on a hope for release to a drug abuse program than mounting a defense to the forgery charge, the commission of which she had professed not to remember. When this "streetwise" accused had nothing more for the court to know, she was promptly arraigned and permitted her attorney to enter a plea of not guilty.

The court took up and ultimately granted her motion to quash the first enhancement paragraph of the indictment, and then correctly admonished appellant as to the resultant reduced range of punishment and, upon her request, caused the record to reflect that the prosecution would be conducted on her true name, Louise Meyers. Addressing her option to have the jury about to be impaneled assess punishment, the court suggested she confer with counsel in this regard and assured her that he "will represent you to the best of his ability" and if she "wish[ed] to cooperate with him" she should "do so at this time." Whereupon the jury panel was to be seated in the courtroom and a short recess was taken.

When court reconvened, that further negotiations had transpired became readily apparent. Upon inquiry by the trial judge, the assistant district attorney announced that the State "waive[d] the enhancement on this case," and the court now admonished appellant that the range of punishment was from two to ten years confinement and a fine up to five thousand dollars. The judge alluded to "this document you have signed"—"Waiver of Constitutional Rights, Agreement to Stipulate, and Judicial Confession," [12] and ascertained that appellant was then prepared to enter a plea. When she pleaded guilty the trial court admonished her in terms of Article 26.13, supra, that applied.[13] Her plea was accepted, the combination waiver, agreement and confession was admitted and appellant personally confirmed her agreement "to the facts stated in the stipulation." Appellant did not offer evidence, but her attorney requested a presentence investigation report—it being the expressed understanding of appellant that "the status of the negotiations" was such that a report would be obtained. The trial court found appellant guilty of the offense of forgery and announced that a presentence investigation and report would be ordered—the probation officer to consider any evidence appellant wished to submit in writing.

When court convened October 27, 1980, neither party proffered additional evidence, the court assessed punishment at five years confinement and, appellant not waiving ten days, reset the cause for sentencing. That occurred November 6, 1980, after a pro forma motion for new trial was overruled. Appellant gave notice of appeal, counsel was permitted to withdraw and arrangements were made for appointment of new counsel.

■■■ The constitutional key to validity of a guilty plea is that it be voluntary and intelligently made and, if upon advice of an attorney, that counsel be reasonably competent and render effective assistance. *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970); *Parker v. North Carolina*, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970); *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25

---

A: No, sir. I found that out at central records and they told me he sent a copy up, said a psychiatric evaluation had been ordered.
Q: You wish the Court to know anything further, Miss Hill?
A: I guess not.
Q: I beg your pardon?
A: No, sir."

**12.** Thus, *inter alia*, appellant waived trial by jury and made a written confession in the exact language of the indictment charging the primary offense, as well as endorsing performance of her attorney, and expressed her understanding that the prosecutor would make no recommendation as to punishment.

**13.** Appellant responded that she was pleading guilty because she was guilty "and for no other reason," that she had not been threatened in any way nor promised anything to do so; her attorney attested to her competency after the judge alluded to his own awareness of the psychiatric reports.

L.Ed.2d 747 (1970); see *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); cf. *Ex parte Harris*, 596 S.W.2d 893, 894 (Tex.Cr.App.1980); see also *Ex parte Bratchett*, 513 S.W.2d 851, 854 (Tex. Cr.App.1974). The purpose and function of the mandates of Article 26.13, then, are to ensure that only a constitutionally valid plea is entered and accepted by the judge of the trial court, and substantial compliance with its dictates is required. *Whitten v. State*, 587 S.W.2d 156 (Tex.Cr.App.1979). "The overriding concern is whether a defendant has been deprived of due process and due course of law," *Ex parte Lewis*, 587 S.W.2d 697, 700 (Tex.Cr.App.1979).

■ The decision on what plea is entered is personal to an accused. *Brady v. United States*, 397 U.S. 742, 748, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970); Moses, Criminal Defense Sourcebook 548. The Article 26.13 admonishment to appellant is facially impeccable, and there is nothing to show that, between the time the trial judge suggested that she cooperate with counsel and when the trial judge actually accepted her plea of guilty, appellant's decision to change was not her own personal one. At that point she had heard one enhancement paragraph dismissed by the court on the initiative of her attorney, and knew the beneficial consequences to her prospects; there had been further negotiations, to which she was privy, resulting in abandonment and dismissal of all alleged enhancements; she had executed papers properly to implement a plea of guilty before the court and to support a finding of guilt; when admonished she made no more protest about performance of her attorney.

These particulars appellant does not now dispute. The essence of her argument is that (though everything seemed letter-perfect and she made no further plaint) the

trial court "should have inquired into the *earlier areas of conflict*" with counsel. We do not agree.

Thoroughly analyzed and carefully interpreted, the complaints voiced by appellant at the pretrial hearing simply did not rise to a level of ineffective assistance high enough to warrant further inquiry.

■ Her grievances against counsel went to what she saw as his inattention while she sat in jail under a "no bond" order, his reported unavailability to others who held out hopes for her participating in rehabilitative drug programs and, finally, his harsh manner in conversing with her when he did.[14] But in the course of expressing them appellant did reveal that a week earlier her attorney said, in effect, "take this and go on" otherwise "you are going to get a life sentence"—a clear allusion to his informing her about plea negotiations and advising her in that regard in terms that may be commonplace. See, e. g., *Kelly v. State*, 499 S.W.2d 154, 156 [15] (Tex.Cr.App.1973). Moreover, apparently during the same visit, appellant reports that counsel told her there was "nary one" defense to the charge—and, from a showing in the record that she was literally caught in the act, the evaluation is quite correct; still, given every opportunity by the trial judge to identify defensive witnesses, appellant referred to "a woman from a justice organization ... [and] ... a bunch of people." Finally, she confirmed counsel's obtaining the psychiatric examination and filing the motion to quash.

Thus, in light what already was made to appear to him, the inquiry that the trial judge did make and the conclusions produced during the pretrial hearing were so full and complete that when it later came to following Article 26.13, supra, the trial court was not required to reopen the matter in order substantially to comply with its

---

14. We do not know, the trial court did not find, whether counsel made demand for payment of a fee of five thousand dollars, and surely none would condone that. However, making the demand does not render him ineffective here, for it is clear enough that counsel went on and provided representation, as he was, of course, obliged to do.

15. The guilty pleading defendant there contended that he had been persuaded and overreached by his attorney to enter a plea of guilty when among other things he told his client, "That I couldn't beat it, you know, if I tried to fight it I would probably get more time."

admonishment provisions. See *Bullard v. State*, 548 S.W.2d 13, 21–22 (Tex.Cr.App. 1977); *Buckner v. State*, 538 S.W.2d 132, 134 (Tex.Cr.App.1976); *Gaither v. State*, 479 S.W.2d 50, 51 (Tex.Cr.App.1972). The ground of error is overruled.

The judgment of conviction is affirmed.

TEAGUE, J., not participating.