David Lee HOLLAND, Appellant,

v.

The STATE of Texas, Appellee.

No. 69647.

Court of Criminal Appeals of Texas.

July 13, 1988.

Rehearing Denied Oct. 19, 1988.

310

James A. DeLee, Port Arthur, for appellant.

Tom Maness, Dist. Atty., and John R. DeWitt, Asst. Dist. Atty., Beaumont, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

W.C. DAVIS, Judge.

Appellant was convicted in Jefferson County for the offense of capital murder. See V.T.C.A., Penal Code 19.03. After the jury affirmatively answered the special issues submitted under Art. 37.071, V.A.C.C.P., the trial court imposed the death penalty as required by law and this direct appeal followed. We will affirm.

The Grand Jury returned two indictments alleging the murders of bank employees Helen Barnard and Dianna Jackson in the course of committing and attempting to commit the underlying felony of robbery. V.T.C.A., Penal Code, 19.03(a)(2). The State elected to proceed in the prosecution for the death of Mrs. Barnard. After a lengthy voir dire, the appellant entered a plea of guilty to the capital charge in front of the jury. A unitary proceeding followed with the submission of testimony and evidence by both sides, after which the jury was instructed to return a verdict of guilty and to answer the special issues submitted.

Appellant advances five points of error. In his first point he claims denial of a bifurcated trial as required by Art. 37.071, supra. Next, he argues that he was denied effective assistance of counsel because of various acts or omissions of his two appointed attorneys during trial. Third, appellant contends it was error to accept his guilty plea without proper admonishments given an alleged "apparent" disagreement between appellant and his trial counsel. In another point appellant complains that the trial court erred in allowing the State's expert witness, Dr. James Grigson, to an-

swer a hypothetical question regarding the probability of future dangerousness. In his final point of error, appellant contends the evidence is insufficient to sustain an affirmative response to special issue number two. The sufficiency of the evidence supporting his plea of guilty is not challenged. However, given appellant's last point of error, we now briefly review the evidence presented to the jury. Viewed in the light most favorable to the verdict, the record reflects the following facts.

On July 11, 1985, appellant was arrested by Jefferson County authorities and charged with felony theft, the result of an alleged check-kiting scheme involving over $100,000 in bad checks with a real loss of over $35,000 to a local bank. He was released on bail.

In a separate transaction nine days before, appellant had purchased a new automobile for his step-daughter with a check drawn on yet another account. The same day appellant was arrested in the theft case, he was also notified by the car dealer that his check had been returned due to insufficient funds.

On July 12th, the record reflects appellant went to two banks and discussed opening various business and personal accounts with bank employees. At First Texas Savings Association in Port Neches, he unsuccessfully attempted to open an account with a bogus $1,500 check. At another institution he talked about opening a new business, spending the time looking around the bank lobby and into the glass-enclosed offices.

Three days later, on July 15th, witnesses testified appellant called the automobile dealership and promised payment on the hot check by 9:30 the next morning.

On the morning of July 16th, appellant left his house and drove into Port Arthur. Before leaving home, he armed himself with two guns, a .45 caliber pistol and a .25 caliber handgun. Both semi-automatic weapons were loaded. Appellant later told Detective Edmond Chesson of the Port Arthur Police Department that he had decided over the previous weekend he would have to get money in some way and was intend-

ing to rob "some" business. To this end, he carried the two pistols, the smaller .25 caliber as "backup."

By 9:30 a.m., appellant was "casing" the Jefferson Savings and Loan branch bank building on 39th Street in Port Arthur. According to his admissions to officers, he waited until there were no walk-in customers before entering the bank. At this point, appellant's initial movements are chronicled on tape, courtesy of a delayed time frame videotape camera.

The events depicted on the tape are corroborated by appellant's own statements to police. After entering the bank at 9:43, appellant walked up to the tellers' counter, where he spoke with the two women on duty. Waiting until a drive-through customer had conducted her transaction and driven off, appellant then brandished a gun and ordered the tellers to give him the money from their cash drawers. Feeling that there would be more money in the vault, appellant then escorted the two women into the vault area, disappearing from view of the camera. In the next two and one-half minutes the women opened a smaller safe and gave him a cash drawer containing more money. Appellant told police he vascillated about what to do with the women, but finally "did it," shooting Barnard once through the head and Jackson once through the chest. Death was probably instantaneous in the former case while emergency resuscitation efforts failed in the latter. At 9:53 appellant reappeared on tape and left the building. He returned two and one-half minutes later, walked straight up to the video camera equipment and shut off the machine.

Within thirty minutes of the double killing, appellant called the automobile dealer and told them he was on his way with money. He gave employees $3,600 and later returned with an additional $1,900. Still short of covering the amount of the check, appellant told an employee of the dealership that he would have the rest of the money in a few days.

That afternoon, appellant and his wife ran errands, paid bills, and ate lunch at a local fast-food restaurant. He also drove

his wife and children out near the Beaumont Municipal Airport, where, unknown to them, he discarded the empty cashdrawer by tossing it into an irrigation canal.

Upon viewing the bank videotape, bank and police officials tentatively identified appellant as the robber.[1] Officers went to appellant's home to interview him. Appellant was told he was not under arrest but was asked to put on his shirt and shoes and accompany the officers to the station house. Once there, appellant was given his *Miranda*[2] warnings and questioned. After it became obvious that appellant's story conflicted with that as told by his wife, and after police became aware of blood stains on his shirt and shoes, appellant was arrested on the instant charge.

Equipped with a search warrant, officers returned to appellant's residence, where various weapons and a supply of ammunition were discovered, including .45 and .25 caliber handguns. Robert Fleming, firearms examiner for the Houston Police Department, later testified that two fired bullets discovered in the vault area near the two victims had been fired from the .45 caliber weapon. Trace metal tests conducted on appellant showed the outline of two guns to the right and left sides of the abdomen, of a size consistent with the guns seized at appellant's residence.

A warrant was also executed to draw a specimen of appellant's blood. Found to be type "A", appellant's blood type was found to be different from the type "O" blood stains on his shirt and shoes. Both victims had "O" type blood.

After executing the search warrant for appellant's residence, Port Arthur Police Detective Edmund Chesson received word that appellant wished to speak with him. Appellant told the officer he wanted to first talk with his wife and then tell the police what had happened. After giving details of the robbery-murder, appellant took officers to the location where he had disposed of the empty cash drawer. The instant prosecution followed.

In his first point of error, appellant asserts the trial court erred in denying him the benefit of a bifurcated trial. He reasons that Art. 37.071, supra, mandates a bifurcated proceeding in capital cases, and that the "trial of a capital case must be to a jury," citing as authority Art. 1.13, V.A.C.C.P., Art. 1.14, V.A.C.C.P., and this Court's decisions in *Ex Parte Dowden*, 580 S.W.2d 364 (Tex.Cr.App.1979) and *Ex Parte Sparks*, 372 S.W.2d 697 (Tex.Cr.App.1963). Thus, appellant argues, since the trial must be before a jury, under the doctrine of Art. 37.071, supra, there must be "two separate deliberations or at least separation of the guilt stage from punishment." He argues, in addition, that such a customary procedure, where the jury is instructed in one document both to find the defendant guilty and then instructs the jury to answer the special issues under Art. 37.071, supra, is inherently erroneous because such a procedure "is tantamount to saying to the jury, 'return the death penalty.'" We do not agree.

■ Initially, appellant's point of error is multifarious and presents nothing for review. Art. 40.09, V.A.C.C.P. *Morin v. State*, 682 S.W.2d 265 (Tex.Cr.App.1983), and cases therein cited. Given the gravity of the sentence, however, we shall deal with each of appellant's claims under his first point of error.

■ In felony cases, a plea of guilty before the jury "admits the existence of all necessary elements to establish guilt, and in such cases, the introduction of testimony by the State is to enable the jury to intelligently exercise the discretion which the law vests in them touching the penalty to be assessed." *Ex Parte Williams*, 703 S.W.2d 674 (Tex.Cr.App.1986), citing *Williams v. State*, 674 S.W.2d 315 (Tex.Cr.

---

1. Based upon the general physical characteristics and mannerisms of the robber, appellant was tentatively identified as the suspect by Jacqueline Duhon, an EMS technician then working for an ambulance service located next to the bank, by Betty Sanford, a vice-president of the bank who had worked with appellant, and P.A. P.D. Detective Edmond Chesson, involved in appellant's April, 1985 arrest.

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

App.1984); *Brinson v. State*, 570 S.W.2d 937 (Tex.Cr.App.1978); *Brown v. State*, 507 S.W.2d 235 (Tex.Cr.App.1974); *Renesto v. State*, 452 S.W.2d 498 (Tex.Cr.App.1970); *Darden v. State*, 430 S.W.2d 494, 495 (Tex. Cr.App.1968), and cases there cited.

In *Williams v. State*, supra, a capital defendant pled guilty before the jury and was ultimately assessed the death penalty. That appellant argued on appeal that the capital murder statute and Art. 37.071, supra, are formulated only for bifurcated trials and that past decisions by this Court uniformly hold that pleas of guilty are not bifurcated trials. *Williams*, supra, at 318. See also *Basaldua v. State*, 481 S.W.2d 851 (Tex.Cr.App.1972); *Ring v. State*, 450 S.W. 2d 85 (Tex.Cr.App.1970). The appellant contended the logical extension of this reasoning was that it was improper to allow a defendant to plead guilty to a capital offense because Art. 37.071, supra, authorizes only bifurcated trials in capital causes.

We initially declared that Art. 37.071, supra, is a mandatory procedure in a capital cause once a finding of guilt is had, whether that finding be by guilty plea to a jury or by a not guilty plea to a jury. See *Williams*, supra. In footnote two of the opinion, we then noted:

> The plea must be to a jury so as to comply with the limitations of Art. 1.14. Whether such a procedure, where a guilty plea is entered, is to be denominated unitary or bifurcated is moot. Art. 37.071 governs all capital cases and it provides for a trial by jury upon the issues related to punishment.
> Id at 319.

The Texas capital murder sentencing scheme requires that a jury determine punishment, regardless of the plea. See *Williams*, supra; *Bullard v. State*, 548 S.W.2d 13 (Tex.Cr.App.1977). Article 26.- 14, V.A.C.C.P.[3] also applies to the instant case and should be read in conjunction with

Art. 37.071, supra, since the jury is given the choice of assessing two possible punishments. Consistent with our holding in *Williams*, supra, we hold that a plea of guilty before a jury in a capital case constitutes trial by jury whether such a proceeding be denominated "bifurcated" or "unitary" in nature. See also *Morin v. State*, supra; *Williams v. State*, 522 S.W.2d 483 (Tex.Cr.App.1975); *Rojas v. State*, 404 S.W.2d 30 (Tex.Cr.App.1966).

■ Moreover, we find no error in the manner in which the jury was charged to return an instructed verdict in the same instrument which gave the charge on punishment. It is well established that in a felony case where a defendant has entered a guilty plea before the jury, because there remains no issue of guilt to be determined, it is proper for the trial judge in his charge to instruct the jury to return a verdict of guilty, charge the jury on the law as to the punishment issues and then instruct them to decide only those issues. *Fairfield v. State*, 610 S.W.2d 771 (Tex.Cr.App.1981); *Basaldua v. State*, supra; *Griggs v. State*, 451 S.W.2d 481 (Tex.Cr.App.1970); *Gillies v. State*, 171 Tex.Cr.R. 175, 346 S.W.2d 612 (1961). See also McClung's Jury Charges for Tex.Cr.Practice (1987) at 228; McCormick and Blackwell, 8 Texas Criminal Forms 9th Ed, § 80.08. Such a directed verdict of guilty is also permissible in capital cases where the defendant pleads guilty. See *Morin v. State*, supra.

Furthermore, we are not convinced that a combination instructed verdict and charge on punishment "constitutes error because it places the question of absolute guilt more in the minds of the jury as they deliberate since they have been ordered in the same document to find him guilty" as appellant argues. Appellant was aware of the consequences of his plea; it was for all purposes a knowing and voluntary plea as discussed *post*. It does not logically follow that the jury, instructed on the first two

---

**3.** Art. 26.14 states:

> Where a defendant in a case of felony persists in pleading guilty or in entering a plea of nolo contendere, if the punishment is not absolutely fixed by law, a jury shall be impan- eled to assess the punishment and evidence may be heard to enable them to decide thereupon, unless the defendant in accordance with Articles 1.13 or 37.07 shall have waived his right to trial by jury.

special issues under Art. 37.071, supra, would necessarily and unavoidably answer each special issue in the affirmative. From the record it is clear that the members of the voir dire panel were apprised of the two possible punishments in the case and how each would be assessed as determined by the panel's response to the special issues. Contrary to appellant's assertion in his brief, the record does not show the jury or other participants to have been "stunned" by appellant's choice of plea following the reading of the charges against him. Nor does the record reflect any attempt by the trial court to indirectly or directly affect the deliberations of the jury. Appellant's first point of error is overruled.

In his second point of error appellant claims he was denied effective assistance of counsel by failure of his trial counsel to "protect his interest and rights during trial." Specifically, appellant points to five "acts" or "omissions," the cumulative effect of which he claims to show ineffective assistance by trial counsel. First, appellant decries his trial counsel "allowing" or "advising" appellant to plead guilty to a capital charge. In three other instances appellant claims his trial counsel (a) failed to object to the trial court's granting of the State's challenge for cause on four venire persons; (b) failed to object to the trial court's refusal to grant appellant's challenge for cause on three different prospective jurors or ask for additional peremptory challenges; and (c) failed to challenge for cause *any* prospective juror before exercising any of his other peremptory challenges. Finally, appellant complains of trial counsel's "failure" to object to psychiatric testimony going to the second special issue by the State's psychiatrist, Dr. James Grigson. Before addressing each of those concerns in turn, we will briefly enunciate the proper standards for review on appeal of an ineffective assistance claim.

In *Hernandez v. State*, 726 S.W.2d 53 (Tex.Cr.App.1986), this Court adopted as the litmus test to determine the validity of an effective assistance claim the standard handed down two years earlier by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In *Strickland*, supra, the Supreme Court held that in order to show ineffective assistance, a convicted defendant must (1) show his trial counsel's performance was deficient, in that counsel made such serious errors he was not functioning effectively as counsel, and (2) show that the deficient performance prejudiced the defense to such a degree that appellant was deprived of a fair trial. In this context, "prejudice" is demonstrated when the convicted defendant shows a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. 104 S.Ct. at 2068. On appeal, therefore, the reviewing court must first determine whether, in light of *all* the circumstances, the acts or omissions were outside the wide range of professional competent assistance, Id. 104 S.Ct. at 2066, and if so, whether there is a reasonable probability the result of the trial or proceeding would have been different absent such deficient conduct.

■ Turning back to the first instance of alleged deficient conduct, we do not find any evidence in the record to support appellant's allegations he was "allowed" or "advised" to plead guilty, nor has appellant provided us with such evidence or authority in support of his proposition. The record reflects that appellant, after the indictment was read, began to apologize in a general fashion until quieted by the trial judge. He then pled "guilty," but before the plea was accepted by the court, the jury was retired and appellant was fully admonished as to the voluntariness and consequences of his plea. Given the evidence marshalled by the State against appellant, including his own incriminating statements, we cannot say that the choice of plea, whether spontaneous or through advice of counsel, was strategically incorrect or unacceptable.[4] In any event, the Court will not

---

4. In this context we also note that appellant now claims that a plea of *nolo contendere* should have been entered, if any negative plea was entered at all. We agree with the State that, even with the advantage of hindsight, a *nolo* plea would be of poor strategic judgment,

second-guess such a trial decision. *Hernandez v. State*, supra; *Ex Parte Perkins*, 706 S.W.2d 320 (Tex.Cr.App.1986); *Cannon v. State*, 668 S.W.2d 401 (Tex.Cr.App. 1984); *Mercado v. State*, 615 S.W.2d 225 (Tex.Cr.App.1981).

Next, appellant claims trial counsel was deficient in failing to object to the court's grant of the State's challenges for cause to four prospective jurors, Brenda Methvin, Robert Young, Arthur Jolivet and Alvie R. Brown.

In three of four cases mentioned by appellant, the State lodged a challenge for cause based upon Art. 35.16(a)(9) and (b)(1), (3), V.A.C.C.P. Subsection (a)(9) allows a challenge to either party who demonstrates bias or prejudice by a prospective juror toward or against a defendant. Subsection (b) provides in pertinent part:

> (b) A challenge for cause may be made by the State for any of the following reasons:
>
> 1. That the juror has conscientious scruples in regard to the infliction of the punishment of death for crime, in a capital case, where the State is seeking the death penalty;
>
> \* \* \* \* \* \*
>
> 3. That he has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment.

Certainly, bias or prejudice against the range of punishment applicable by law, including the death penalty, is a proper area of inquiry before exercising a challenge for cause or a peremptory challenge. *Livingston v. State*, 739 S.W.2d 311 (Tex.Cr.App. 1987); see also *Carter v. State*, 717 S.W.2d 60 (Tex.Cr.App.1986); *Mathis v. State*, 576 S.W.2d 835 (Tex.Cr.App.1979); *Martinez v. State*, 588 S.W.2d 954 (Tex.Cr.App.1979). It is also true that a prospective juror is properly excused when his views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 105

S.Ct. 844, 83 L.Ed.2d 841 (1985), citing *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). See also *Livingston v. State*, supra; *Montoya v. State*, 744 S.W.2d 15 (Tex.Cr.App.1987); *Carter v. State*, supra; *Sharp v. State*, 707 S.W.2d 611 (Tex.Cr.App.1986); *Bird v. State*, 692 S.W.2d 65 (Tex.Cr.App.1985). With the above in mind, we may turn our attention to the voir dire examinations of Brenda Methvin, Arthur Jolivet and Alvie Brown.

Brenda Methvin worked at a certain credit union where appellant's son was a member, and was acquainted with him for that reason. Her husband was also well acquainted with one of defense counsel's associates, and in fact was presently negotiating with the firm for office-sharing purposes. The venirewoman stated that these business interests and associations would have a detrimental effect on her performance as a juror in the case. Although she personally believed in the death penalty, she could not herself sentence someone to death. Overall, Methvin made it very clear that she would "automatically" and under all circumstances vote against a sentence of death by answering the special issues submitted at the punishment phase of trial in a negative form, even though she was satisfied beyond a reasonable doubt that the answer should be "yes."

Arthur Jolivet was a personal acquaintance of appellant, having worked under appellant's supervision at a local truck stop for a period of some three or four months. Jolivet stated that he could not find appellant guilty even though the evidence demonstrated guilt beyond a reasonable doubt, because appellant had been kind to him and respected him "as an old man." Jolivet also had a preconceived notion of appellant's culpability:

> Q Based on what you have heard on TV and also radio, do you have an opinion as to whether or not Mr. Holland is guilty?
>
> A I couldn't believe the man done it. You know, after knowing him, I just couldn't believe he done it.

---

since the record reflects that defense strategy was to admit culpability then build up the appel-

lant's character and reputation throughout the trial.

**316**

Q You are saying based on what you have heard, without hearing any of the evidence, you have the opinion right now that he is not guilty, or he is innocent?

A Well, it is not really because of what I heard. And I hope I am not taking up your time.

Q Not at all.

A Knowing the man, I just don't think he would do something like that.

In addition, Jolivet made it abundantly clear that his personal feelings toward appellant would affect and influence his verdict in the case, contrary to his oath as a juror:

Q Basically, the oath says that you and each of you do solemnly swear that in the case of the State of Texas against the defendant you will a true verdict render according to the law and the evidence, so help me God. So before you sit down there you have to take an oath and before you actually decide what you are going to do, the Judge instructs you on the law. Now what you told Mr. Latino is that regardless of what the Court tells you in its instructions, and regardless of that oath, because of the fact that you personally know Mr. Holland, because of the fact that you have feelings about him, based on what you know, would you disregard the Court's instructions, would you disregard your oath and you would have to answer those questions no so that he would not receive the death penalty. Is that correct?

A Yes.

Q That is how you feel?

A That is how I feel.

Q And it doesn't matter how bad the case is, if he killed and rape (sic) a hundred nuns, then killed each one of them, you would still say what you just did and that is because you know him, you would let that affect you and influence you in your verdict. Is that correct?

A That is correct.

Q You are saying that your personal views are going to prevent or substantially impair your performance of your duties as a juror regardless of the court's instructions, regardless of your oath, that you actually would be guided in the final analysis by your personal beliefs about Mr. Holland rather than the law. Is that correct?

A Well—(pause)—I can't dispute the law, but I still feel like I couldn't give the man the death penalty. I believe in the law and I don't have— because we have to have the law to live in the world. But I am telling you may (sic) feelings towards the man. And I would like, if it is possible, not to be on this jury on either side for this, on this occasion.

\* \* \* \* \* \*

Q I think you understand if you have personal information about the defendant, then you couldn't be fair and impartial. Isn't that correct?

A Yeah, I feel partial about it. I couldn't hurt the guy.

Q You couldn't hurt the guy even if you received instructions from the Court, even if you took an oath to follow the law because of your personal feelings, they would override that?

A Yeah, I feel that way.

And on examination by the defense:

Q Regardless of any information that you hear, you can't follow the law?

A No, I couldn't. I know the fellow and I—I am not saying that anybody can't do anything, I am not saying anything like that. I just know the fellow, I wouldn't want to be the one to do this. I would say no.

And finally, upon being questioned by the trial judge:

THE COURT: Mr. Jolivet, I'm Judge Giblin. If the State proved to you that beyond a reasonable doubt that Mr. Holland is guilty, could you find him guilty?

MR. JOLIVET: I don't believe I could.

THE COURT: You are saying you don't believe. I want to know if you can or can't.

MR. JOLIVET: No.

Very simply put, Arthur Jolivet, in response to questions by both counsel and the court, clearly stated that he would not find appellant guilty or assess punishment, regardless of his oath, because of his deep-seated loyalty to appellant.

Alvie Brown began by saying he believed in the death penalty and *could* sit on a jury and assess the ultimate sentence. However, he would hold the State to a higher burden of proof in a capital case, to the extent that guilt must be proven beyond *all* doubt. To this end, Brown would not view circumstantial evidence as sufficient to support a guilty verdict, but would require "concrete evidence." His ultimate definition of "concrete evidence" would be an "eyewitness" to the crime. After vacillating back and forth, and after two of the State's challenges were denied, Brown settled on the absolute necessity for an "eyewitness" before reaching a guilty verdict and was thereafter excused by the trial court.

▆ Analysis of the record shows that Brenda Methvin and Arthur Jolivet, because of their personal and family associations with appellant and his counsel, expressed their inability to be fair to the State, thus expressing bias for the defendant. Both were properly excused for cause under Art. 35.16, supra. See *Anderson v. State*, 633 S.W.2d 851 (Tex.Cr.App.1982); *Noah v. State*, 495 S.W.2d 260 (Tex.Cr.App. 1973); *McCary v. State*, 477 S.W.2d 624 (Tex.Cr.App.1972). Alvie Brown, on the other hand, expressed no overt bias for or against a party to the case, but would have held the State to a higher burden of proof, that being beyond *all* doubt of guilt and based solely on "concrete" or "eyewitness" evidence, rather than on circumstantial evidence of guilt. Brown was properly excused under Art. 35.16, supra. See *Little v. State*, 758 S.W.2d 551 (Tex.Cr.App.1988); *Jackson v. State*, 745 S.W.2d 4 (Tex.Cr. App.1988); *Sawyers v. State*, 724 S.W.2d 24 (Tex.Cr.App.1986). See also *Barnard v. State*, 730 S.W.2d 703 (Tex.Cr.App.1987); *Bodde v. State*, 568 S.W.2d 344 (Tex.Cr. App.1978). Moreover, each of the three

prospective jurors held beliefs or expressed views toward imposition of the death penalty which would either prevent or substantially impair them in their performance under their oath as jurors in the case. See *Livingston v. State*, supra; *Montoya v. State*, supra; *Carter v. State*, supra; *Clark v. State*, 717 S.W.2d 910 (Tex.Cr. App.1986). See also *Nethery v. State*, 692 S.W.2d 686 (Tex.Cr.App.1985). The three venire persons were properly excused.

▆ In addition to the three veniremen discussed above, appellant also claims counsel erred in not objecting to the State's challenge to Robert Young. During his brief *voir dire* session, Young admitted that he had pled guilty and was convicted of the class 'B' offense of theft on March 10th, 1981, in cause number 93788. A venireman's conviction for misdemeanor theft is sufficient to constitute an absolute disqualification. Art. 35.19, V.A.C.C.P.; Art. 35.16, supra; *Frame v. State*, 615 S.W.2d 766 (Tex.Cr.App.1981). As it appears that each of the four prospective jurors in question were properly excused, counsel was under no obligation to object. See and cf. *Meanes v. State*, 668 S.W.2d 366 (Tex.Cr. App.1983).

Next, in two related claims under his second point of error, appellant argues that trial counsel was ineffective in failing to object to the trial court's overruling of defense challenges for cause to three prospective jurors, Raymond Rice, Patricia Embs and Janice Foret, and erred further by making no challenges for cause before exercising his other peremptory challenges. Again, appellant merely speculates on the propriety of such a course of action, and provides no specifics as to why a challenge would be upheld nor any authority for his claim. We are told that a defense challenge to one or more of the four venirepersons "might have weighed heavily on the court to change its mind," and that if trial counsel had made such challenges or requested further peremptory strikes, appellant may have been able to secure a "favorable" juror.

Appellant fails to explain why the challenges for cause to the three named prospective jurors were improperly denied, so that trial counsel could have lodged a valid objection to the trial court's action. Again, we are asked to speculate as to what could have happened if appellant had requested and received additional peremptory challenges. Appellant has completely failed to carry his burden of establishing prejudice from alleged "error" in the trial court's "failure" to excuse any of the three named prospective jurors for cause, nor does he point to any specific objectionable juror he was forced to accept on the case. See *Sharp v. State*, supra. Appellant, having failed to allege facts which would demonstrate any or all of the three named jurors incapable or unfit to serve on the jury, has preserved nothing for review regarding the trial court's action in this matter. See *Barney v. State*, 698 S.W.2d 114 (Tex.Cr.App.1985). And since appellant has failed to show that he was forced into taking an objectionable juror, there is no showing of harm. Any "error" by trial counsel not objecting to the denial of the defensive challenge would not be reversible error. See *White v. State*, 629 S.W.2d 701 (Tex.Cr.App.1981); *Garcia v. State*, 626 S.W.2d 46 (Tex.Cr.App.1981); *Doggett v. State*, 530 S.W.2d 552 (Tex.Cr.App.1975); *Story v. State*, 502 S.W.2d 764 (Tex.Cr.App.1973); *Williams v. State*, 481 S.W.2d 119 (Tex.Cr.App.1972).

Moreover, in evaluating a prospective juror's responses, we recognize that we are faced with only a cold record; therefore, we give deference to the trial judge who is in a position to see and hear the juror. *Bird v. State*, supra. See also *Franklin v. State*, 693 S.W.2d 420 (Tex.Cr.App.1985); *Barney v. State*, supra; *Phillips v. State*, 701 S.W.2d 875 (Tex.Cr.App.1985). The rule is especially true when we are faced with seemingly equivocating responses. A review of the record shows that prospective jurors Rice and Embs equivocated in their responses to questions but ultimately said they would follow the court's instructions and render a verdict according to the evidence. According due deference to the trial court's ability to assess the prospective jurors' demeanor and sincerety as based upon the record before us, prospective jurors Rice and Embs were not subject to a challenge for cause despite their initial responses. Furthermore, we find appellant's claim that trial counsel should have exercised more challenges for cause to be without merit. Trial counsel successfully challenged the qualifications of nine prospective jurors. Others, including Rice and Embs, were struck after the defense challenge was denied. Prospective juror Foret was struck by the defense without being challenged, after giving "model" responses to all questions without equivocation or hesitation. After careful review of the record before us, we are unable to find counsel's actions in not objecting to the trial court's denial of the challenges for cause of Rice and Embs to be unprofessional under the *Strickland* test, and appellant has apparently misread the record pertaining to venireperson Foret.

Next, appellant complains that the State's expert witness, psychiatrist Dr. James P. Grigson, was allowed to testify at the punishment phase, without objection, as to appellant's future dangerousness under special issue number two.[5]

Dr. Grigson is a well known courtroom psychiatrist who is usually found testifying for the State in these matters. Without having examined appellant and based upon hypothetical facts following those in the instant case, Dr. Grigson testified, *inter alia*, that he was 100% sure appellant would constitute a continuing threat to society. Contrary to what appellant now argues in his brief, trial counsel conducted a vigorous cross-examination of the State's witness, effectively casting at least some doubt on the witness' theories. Since such hypothetical testimony is admissible to support an affirmative finding as to the second special issue, see *Livingston v. State*, su-

---

5. Art. 37.071(b)(2) requires the jury to respond affirmatively or negatively to the issue "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."

pra; *Smith v. State,* 683 S.W.2d 393 (Tex. Cr.App.1984); *Williams v. State,* 668 S.W. 2d 692 (Tex.Cr.App.1983); *Vanderbilt v. State,* 629 S.W.2d 709 (Tex.Cr.App.1981); *Crawford v. State,* 617 S.W.2d 925 (Tex.Cr. App.1980), trial counsel was under no obligation to do what would amount to a futile act. See and cf. *Mays v. State,* 653 S.W.2d 30 (Tex.Cr.App.1983); *Thompson v. State,* 621 S.W.2d 624 (Tex.Cr.App.1981). See also *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

■ The last act complained of is that "there were insufficient numbers of witnesses presented to paint or to portray the appellant in any other light besides what the State was trying to make out of him." Specifically, appellant points to the case of venireman Arthur Jolivet, who stated he had worked with appellant and found appellant to be a decent man who Jolivet could not "hurt."

During the unitary proceeding appellant presented seven witnesses for the defense. Fred Linder, an investigator for the Jefferson County District Attorney's Office, had known appellant as a child and stated appellant had a "good" reputation. Walter Howell first met appellant when he was 15 years old, and never knew him to commit a bad act. Linder had last seen appellant 15 years before trial, while Howell last saw him 6–8 years before the proceeding.

Robert Burnet, an executive employed by Jefferson Savings and Loan, testified that appellant was "very genuine, personable, honest, careful, considerate, respectful, courteous and polite." Appellant's prior criminal history did not change Burnet's mind on cross-examination.

Bill Emfinger, President of Emfinger Trucking, also testified as to appellant's good reputation.

Charles Wiggins, Jr. and Wesley Yates are law enforcement officers who testified that appellant had remained quiet and non-violent while in custody after arrest on the capital charge. In addition, Yates testified

that appellant had lost 50–70 pounds while incarcerated.

Finally, Dr. Allan Houston, the defense expert-psychiatrist, gave testimony based upon the same hypothetical given to the State's Dr. Grigson. Dr. Houston stated he was unable to form an opinion purely from the hypothesis, and further said that the American Psychiatric Association discouraged making a diagnosis based solely on such a hypothetical. There was also testimony tending to show that at least one medical task force had found psychiatrists were unreliable in determining future dangerousness. The defense then rested.

■ It is quite apparent from the record that appellant's trial counsel, working in context of the plea of guilty, brought forth an array of individuals, including businessmen and law enforcement officers, who testified to the general good reputation and specific good character of appellant over a long period of time. In addition, the defense put the issue of Dr. Grigson's credibility directly before the jury, both in their cross-examination of Grigson [6] and through the testimony of their own expert. Included in the group were those who had worked with appellant, as had the prospective juror Jolivet. Even though the defense presumably could have called Jolivet, appellant would have us again speculate as to what the witness' testimony might have been. And even if Jolivet had been called, any speculation based upon his responses during *voir dire* questioning would only lead to a finding that Jolivet's testimony would merely be cumulative of that given by other defense witnesses. Absent a showing by appellant that he would have benefitted from the testimony, the decision not to call witnesses at either stage of trial does not raise the spectre of ineffective assistance. See *King v. State,* 649 S.W.2d 42 (Tex.Cr.App.1983). See also *Moore v. State,* 700 S.W.2d 193 (Tex.Cr. App.1985).

■ Through each of appellant's claims under this point of error, he has failed to

---

**6.** The defense pointed out for the jury's benefit that Grigson has a nickname of "Dr. Death" in some circles.

meet the first, much less the second, step of the *Strickland* test. Counsel's performance was not "deficient" in "failing" to object when certain State challenges for cause were granted or when other defense challenges were overruled, since the record reflects that each prospective juror was excused or kept over challenge according to the mandate of Art. 35.16, supra, or according to the sound discretion of the trial court in determining the performance qualifications of each venireperson. Trial counsel also had no legal reason to object to the testimony of Dr. Grigson, and as a matter of fact, counsel did what they could to rebut Grigson's testimony through cross-examination and the use of their own expert. Too, counsel's overall trial strategy, as shown through their cross-examination of State witnesses and production of defensive witnesses, was geared to showing appellant in the best possible light after he pleaded guilty before the jury.

It is axiomatic that appellant's constitutional right to counsel does not mean errorless counsel where competency or adequacy of representation is argued or judged purely by hindsight. See *Ex Parte Perkins*, supra; *Ex Parte Burns*, 601 S.W.2d 370 (Tex.Cr.App.1980); *Boles v. State*, 598 S.W.2d 274 (Tex.Cr.App.1980); *Harrison v. State*, 552 S.W.2d 151 (Tex.Cr.App.1977). Allegations of ineffective assistance must be firmly founded to be sustained. *Harrison v. State*, supra; *Faz v. State*, 510 S.W.2d 922 (Tex.Cr.App.1974). See also *Ex Parte Raley*, 528 S.W.2d 257 (Tex.Cr.App. 1975). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Butler v. State*, 716 S.W.2d 48 (Tex.Cr.App.1986). Here, appellant pled guilty in a case where there was overwhelming evidence of his guilty conduct in what was categorized as a premeditated, brutal robbery and double execution-style murder.

Given the whole record before us, appellant has failed to show trial counsel's overall performance was deficient, and that, but for such deficiencies, there exists a reasonable probability the result of the proceeding would have been different. Appellant's second point of error is overruled. See *Hernandez v. State*, supra; *Moore v. State*, supra; *Ex Parte Duffy*, 607 S.W.2d 507 (Tex.Cr.App.1980). Cf. *Ex Parte Wilson*, 724 S.W.2d 72 (Tex.Cr.App.1987); *Cannon v. State*, supra; *Ex Parte Raborn*, 658 S.W.2d 602 (Tex.Cr.App.1983); *Ex Parte Dunham*, 650 S.W.2d 825 (Tex. Cr.App.1983); *Weathersby v. State*, 627 S.W.2d 729 (Tex.Cr.App.1982).

In his third point of error, appellant submits that the trial court erred in accepting his guilty plea "when it should have been apparent to the court that there had previously been a disagreement between appellant and his counsel and "a plea of such magnitude should have been accepted only under the most stringent of circumstances and following the most comprehensive admonishments." Specifically, appellant cites a January, 1986 letter to the trial court requesting both appointed counsel be dismissed, wherein appellant states:

> I feel that I am not being represented to the best of (his counsel's) abilities and I do not feel that they have my best interests in mind. I do not wish them to continue as my counsels.

It was this letter, reasons appellant, which should have made the trial court aware that appellant and appellant's counsel were not acting "totally in concert" as should be the case before accepting the plea. The State responds by pointing to various parts of the record reflecting appellant himself wanted to withdraw his request for dismissal of counsel. Moreover, when appellant was questioned as to his plea, the trial judge gave comprehensive admonishments, including a second opportunity for appellant to inform the court of any misfeasance on the part of his appointed attorneys.

As appellant states in his brief before us, a plea of guilty or *nolo contendere* should not be accepted unless it appears that the plea is free and voluntary. See Art. 26.13(b), V.A.C.C.P.; *Brady v. U.S.* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Ex Parte Shuflin*, 528 S.W.2d 610 (Tex.Cr.App.1975). In deciding the vol-

untariness of a plea, the courts have, for better or worse, intermingled the concepts of a knowing, intelligent or voluntary plea, so that a violation of any of the concepts is said to result in an involuntary plea. *Ex Parte Evans*, 690 S.W.2d 274 (Tex.Cr.App. 1985). And, the constitutional validity of a guilty plea made upon the advice of counsel depends whether counsel's performance was reasonably competent, rendering a defendant effective representation during the particular proceedings. See *Meyers v. State*, 623 S.W.2d 397 (Tex.Cr.App.1981).

 As discussed above, appellant presents no evidence that his plea was made upon advice of counsel, nor have we discovered any such evidence in the record. But as the State points out in its brief, even if appellant made his plea based upon advice of counsel, given the overwhelming evidence of guilt that decision cannot be faulted in hindsight. Further, a trial judge should exercise substantial restraint before interfering with the attorney-client relationship and the matter of strategy and tactics. See *Ex Parte Ewing*, 570 S.W.2d 941 (Tex.Cr.App.1978). Such an inquiry should only be made where it does not appear that there exists *any* plausible basis in strategy and tactics for the particular act or acts by counsel. Id. Moreover, while appellant claims the trial court was somehow placed on notice that appellant and his trial attorneys had some "disagreement" between them, so that the court was under a duty to reject the plea of guilty, we have examined the record very carefully and find that the trial judge was aware of possible problems between the appointed counsel and appellant because of appellant's January, 1986 letter. We further find that the judge specifically questioned appellant about his request before the jury *voir dire* began in the case:

> THE COURT: Let the record reflect also that I received a correspondence from Mr. Holland, received by the Court on January 22nd, 1986, requesting that the Court dismiss Mr. Cribbs and Mr. Flores as the attorneys.
>
> Mr. Holland, you still feel that way about these two lawyers?
>
> THE DEFENDANT: No, sir, that is all right, disregard it.
>
> THE COURT: Would you like for me to withdraw that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Let the record reflect the defendant is now satisfied with the attorneys and has requested he withdraw the request to dismiss them, which is granted by the Court.

Furthermore, during the two week *voir dire*, there was ample opportunity for the trial court to observe appellant and counsel and for appellant to make further request or complaint. No complaint was made, and the record reflects no further circumstance that might indicate any such problem.

In any event, once the guilty plea was entered, the trial judge, during the course of admonishing appellant as to the consequences of his plea, again established by direct query that appellant was satisfied with the representation received from appointed counsel. At this time, the court fully admonished appellant according to the requirements of Art. 26.13, supra, and questioned appellant as to his understanding of each single admonishment given. The record clearly reflects that appellant understood the consequences of his plea, was making the plea freely, voluntarily and knowingly because he was in fact guilty, and had no questions for the court regarding the proceedings.

As in the case of *Meyers v. State*, supra, appellant does not dispute the particulars of his own apparent decision to plead guilty in this case, the essence of his argument being that the *trial court*, because of appellant's letter written and received prior to *voir dire*, "should not have accepted this plea of guilty for, surely, the court was aware of the outcome of *Morin v. State* and *Crawford v. State*." [7]

---

7. *Morin v. State*, 682 S.W.2d 265 (Tex.Cr.App. 1983) and *Crawford v. State*, 617 S.W.2d 925 (Tex.Cr.App.1980) are other cases in which the particular defendant chose to plead guilty to capital murder.

Appellant apparently desires this Court to find the trial court deficient for not rejecting appellant's plea, since the trial court "should have known" that a plea of guilty in a capital case "does not usually work to the benefit of defendants." We do not agree. The "overriding concern" in reviewing the constitutional validity of a guilty plea is "whether a defendant has been deprived of due process and due course of law." *Ex Parte Lewis*, 587 S.W. 2d 697, 700 (Tex.Cr.App.1979). Regardless whether the trial court was "aware" of the "implications" simmering under the surface of the *Morin* and *Crawford*, both supra, cases, we will not require or encourage a trial court to substitute *sua sponte* his own opinion for the decision of a criminal defendant to plead guilty unless the evidence introduced reasonably and fairly raises the issue as to the innocence of the accused. See *Griffin v. State*, 703 S.W.2d 193 (Tex.Cr.App.1986) [the standard for a *sua sponte* withdrawal of a guilty plea by court is inexact and must be evaluated in light of all circumstances]; *Jones v. State*, 634 S.W.2d 61 (Tex.Cr.App.1982) [evidence must reasonably and fairly raise issue of innocence]; *Fairfield v. State*, supra, [rule requires withdrawal of plea only when evidence adduced, if believed, would negate guilt of defendant as a matter of law]; *Reyna v. State*, 434 S.W.2d 362 (Tex.Cr. App.1968). Cf. *Burks v. State*, 145 Tex.Cr. R. 15, 165 S.W.2d 460 (1942). See also *Lincoln v. State*, 560 S.W.2d 657 (Tex.Cr. App.1978). The record reflects that appellant began apologizing before the jury when asked how he pled to the indictment. When the trial judge requested he enter a plea, appellant stated that he would plead "guilty." He was thoroughly admonished as to the free, voluntary and knowing nature of his plea, and to the serious consequences arising from his decision. The trial court did not err in accepting appellant's plea of guilty. Appellant's third point of error is overruled.

In his fourth point of error, appellant asserts the trial court erred in allowing the State's psychiatric expert, Dr. James Grigson, to answer a hypothetical question and give his opinion as to the probability that appellant would be a continuing threat to society, because said evidence was "irrelevant" in that Dr. Grigson had no social or professional contact with appellant prior to trial, never reviewed any examination reports on appellant and had no personal knowledge of the case being tried. In addition, appellant opines that his oral confession to a police detective was improperly admitted and that this Court should, despite his plea of guilty, ignore said confession, and in the bargain, find the doctor's opinion, based upon facts "improperly" in evidence, irrelevant. Finally, appellant argues that the hypothetical and opinion derived therefrom was tainted by the addition of a fact not in evidence.

It appears that the prosecutor did add or at least place one fact out of context. Doctor Grigson was told that the hypothetical "person" took the witness stand and began crying and apologizing for his conduct. In truth, appellant did not take the stand and make such statements. He did, however, apologize for his conduct when asked by the trial court to respond to the indictment.

We first note, as does the State in its brief before us, that appellant objected on other, rather nebulous grounds when Dr. Grigson was finally asked for his opinion based upon the hypothetical facts. And appellant raised no objection at all to the hypothetical fact regarding an oral confession. The record reflects when the State requested Dr. Grigson's expert opinion, the following objection was raised:

Q Could you state what that opinion is?

　　MR. CRIBBS: Your honor, we are going to object. *He is only qualified as a psychiatrist, not a predictor of the future.*

　　THE COURT: Overruled.

(emphasis added)

However the trial objection was intended, it in no way comports with his rather general objection as to relevancy now raised on appeal. According to prior authority, since appellant's objection on appeal differs substantially from that raised at trial, this point of error is not entitled to

consideration on appeal. See *Guzmon v. State,* 697 S.W.2d 404 (Tex.Cr.App.1985).

 Moreover, even if this fourth point had been preserved for appeal, appellant has not shown reversible error. A similar point of error was raised and rejected in *Mays v. State,* 726 S.W.2d 937 (Tex.Cr.App. 1986), when Judge Tom Davis wrote for the Court:

> Appellant argues that this (psychiatric) testimony was irrelevant in that Dr. Griffith had never seen appellant prior to trial, never examined him professionally, never viewed any examination reports of anyone who may have examined appellant, and had no personal knowledge of the case on trial. This argument has previously been rejected by this Court. See *Barefoot v. State,* 596 S.W.2d 875, 887–88 (Tex.Cr.App.1980, *cert denied,* 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981). Furthermore, this Court has previously held this type of testimony relevant. See *Moore v. State,* 542 S.W. 2d 664, 675–76 (Tex.Cr.App.1976), *cert denied,* 431 U.S. 949, 97 S.Ct. 2666, 53 L.Ed.2d 266 (1977).

Appellant likens the instant case to *Holloway v. State,* 613 S.W.2d 497 (Tex.Cr. App.1981) and attempts to distinguish this case from *Mays v. State,* supra, and *Barefoot v. State,* 596 S.W.2d 875 (Tex.Cr.App. 1980), by asserting that in this case some facts underlying the hypothetical are inaccurate hearsay, thus rendering the hypothetical inaccurate and the resulting prognosis, if not inaccurate, "certainly irrelevant."

In *Holloway v. State,* supra, this Court reversed a capital murder conviction because the trial court admitted into evidence a psychiatric opinion regarding future dangerousness when the psychiatrist based his opinion only upon interviews with the co-defendant, police officers and a victim of one of the robberies preceding the killing. No hypothetical being involved, the psychiatric opinion was inadmissible since it was not based upon facts "either within (the psychiatrist's) personal knowledge, or assumed from common or judicial knowledge, or established by evidence." *Holloway,* supra, at 503.

In *Barefoot v. State,* supra, a hypothetical question was posed and an opinion as to future dangerousness was admitted over objection. That appellant argued, *inter alia,* that the hypothetical question was improper because it was not based on *all* of the evidence in the case. We disagreed, stating, "[A]lthough a hypothetical question must be based on the facts of the case, counsel may assume the facts in accordance with his theory of the case. If the opponent desires to secure the expert's opinion upon a different set of facts he may do so on cross-examination." *Barefoot,* supra, at 887, 888. (Citations omitted.)

And in *Mays v. State,* supra, the psychiatric opinion was also based upon facts in evidence at the time the opinion was solicited. We distinguished that case from *Holloway,* supra, on the basis of the presence of evidentiary facts supporting the hypothetical question.

In the case at bar, we do not agree with appellant's assertion as to the similarity or differences in *Mays, Holloway* and *Barefoot,* all supra. The case before us is more akin to *Mays* and *Barefoot,* both supra, than to *Holloway,* supra, since the hypothetical question in the first two cases was based upon admitted evidentiary facts and inferences or knowledge arising therefrom. The latter case is distinguishable for the same reason. In *Holloway,* supra, the hypothetical question had no evidentiary or inferential basis, being entirely dependent upon hearsay interviews with persons other than the defendant in the case. Here, the opinion was solicited *before* the additional fact regarding appellant's emotional outburst while on the stand was made. In pertinent part the record reveals the following exchange took place between the prosecutor and Dr. Grigson immediately after appellant's objection to the prescience of the State's expert witness was overruled:

> Q (Contd) (Sic) Yes, Doctor, state your opinion.

**A** My opinion of the person that you described certainly is going to present a continuing threat to whatever society he may be in, that he is extremely dangerous.

**Q** Doctor, let me ask you, suppose that individual who was on trial decided to take the stand. Suppose that individual just broke down and said how sorry he was for what he had done, he started crying and saying that, you know, he just didn't know what came over him, it was just one of those things, what would you think about that?

**A** Well, it is really quite typical of the sociopath to begin conning and manipulating people. In a case such as you have described, it would be to try to manipulate the jury or the Judge or whoever. But again, they would be using the people to get what they want.

The record makes clear that the expert opinion was solicited and received before the prosecuting attorney added the "fact" which has, in truth, no explicit factual basis in the evidence received in the case. Appellant implicitly acknowledges this fact when he states in his brief that Dr. Grigson testified the additional information "definitely just adds to his opinion of the individual that is named in the hypothetical situation." Therefore, the opinion was given in response to a hypothetical question comprised of facts in evidence. See *Mays v. State*, supra; *Barefoot v. State*, supra. Cf. *Holloway v. State*, supra.

■ We do note that Dr. Grigson was *later* asked his professional opinion as to the probability of the person in the hypothetical committing "crimes of violence in the future." Appellant objected on grounds the question had "already been asked and answered, also repetitious", but the objection was denied and no further, more responsive objection was lodged by appellant. Even should we consider this second opinion in light of his general argument under this point of error, we cannot say that the *content* of the hypothetical "fact" was not in evidence given appel-

lant's conduct immediately preceding his entry of the plea of guilty. Appellant's fourth point of error is overruled.

■ In his final point of error, appellant challenges the sufficiency of evidence supporting the jury's affirmative response to Special Issue No. 2, Art. 37.071(b)(2), supra. He asserts that the circumstances of the capital offense are insufficient standing alone to sustain an affirmative answer, that appellant's own reputation witnesses neutralize the State's reputation evidence, and cites Dr. Grigson's "compelling testimony" as based upon an inaccurate hypothetical and rebutted by the defense psychiatrist, Dr. Allen Houston. The State responds by arguing that the "quantity and quality of the evidence" here is greater than that found sufficient by this Court in *Santana v. State*, 714 S.W.2d 1 (Tex.Cr.App.1986); *Green v. State*, 682 S.W.2d 271 (Tex.Cr.App.1984); and *Crawford v. State*, supra.

In determining the sufficiency of the evidence to support the jury's affirmative finding on Special Issue No. 2, the evidence is viewed in the light most favorable to the verdict to determine whether any rational trier of fact could have found the elements of Art. 37.071(b)(2), supra, to have been proved beyond a reasonable doubt. *Livingston v. State*, supra; *Keeton v. State*, 724 S.W.2d 58 (Tex.Cr.App.1987), and cases cited therein.

It is also well settled that a capital jury may consider all the evidence adduced at the initial or guilt phase of trial in answering special issues under Art. 37.071, supra, including the second issue of future dangerousness. *Huffman v. State*, 746 S.W. 2d 212 (Tex.Cr.App.1988); *Livingston v. State*, supra; *Beltran v. State*, 728 S.W.2d 382 (Tex.Cr.App.1987); *Bridge v. State*, 726 S.W.2d 558 (Tex.Cr.App.1986); *Santana v. State*, supra; *Bell v. State*, 724 S.W.2d 780 (Tex.Cr.App.1986); *Garcia v. State*, supra, and cases therein cited. The circumstances of the offense at bar, as well as the planning and aforethought demonstrated in the execution of the crime may also be probative of a particular defendant's propensity to commit future violent

crimes; *Livingston v. State,* supra; see also *Landry v. State,* 706 S.W.2d 105 (Tex. Cr.App.1985); *Demouchette v. State,* 591 S.W.2d 488 (Tex.Cr.App.1979); and such circumstances may alone, if severe enough, be sufficient to support an affirmative answer to the second interrogatory. *Huffman v. State,* supra; *Beltran v. State,* supra; *Carter v. State,* supra; *Holloway v. State,* 691 S.W.2d 608 (Tex.Cr.App.1984); *Smith v. State,* 676 S.W.2d 379 (Tex.Cr. App.1984); *Smith v. State,* 676 S.W.2d 379 (Tex.Cr.App.1984); *Williams v. State,* supra; *Russell v. State,* 665 S.W.2d 771 (Tex. Cr.App.1983); *Mitchell v. State,* 650 S.W. 2d 801 (Tex.Cr.App.1983); *O'Bryan v. State,* 591 S.W.2d 464 (Tex.Cr.App.1979).

Additional factors properly considered by a capital jury which may mitigate or aggravate the punishment assessed include the existence of a prior criminal record and severity of prior offenses, the defendant's age and personal circumstances at the time of the offense, whether the defendant was acting under duress or domination of another at the time the offense was committed, psychiatric evidence, and character evidence. *Livingston v. State,* supra, and cases cited therein; *see also Keeton v. State,* supra, and cases cited therein.

On the other hand, lack of extraneous violent or bad acts, reputation or psychiatric testimony on the issue of future dangerousness does not alone mitigate against an affirmative response to Special Issue No. 2. See *Livingston v. State,* supra; *Bush v. State,* 697 S.W.2d 397 (Tex.Cr.App.1985); see also *Keeton v. State,* supra; *Wallace v. State,* 618 S.W.2d 67 (Tex.Cr.App.1981); *Brasfield v. State,* 600 S.W.2d 288 (Tex.Cr. App.1980); *Warren v. State,* 562 S.W.2d 474 (Tex.Cr.App.1978).

The evidence at the unitary proceeding, as earlier described, showed deliberate murder in the course of robbery, resulting in the execution-style killing of two female employees of the Jefferson Savings and Loan. Appellant, needing a sizeable sum of money to pay off a hot check he had given several days earlier for the purchase of a new automobile from Golden Imports, and already facing felony charges stemming from an earlier check kiting scheme, left his home on the morning of July 16, 1985, with the specific intent of finding a "business" to rob. To this end, he armed himself with both a large caliber primary weapon as well as a small caliber hand gun as a "back-up" weapon.

At 9:43 a.m. that morning, after waiting for customers to leave the branch bank, appellant entered the building and struck up a conversation with the victims, Helen Barnard and Dianna Jackson. At 9:49 a.m. he pulled his .45 automatic pistol and announced the robbery. The two women were herded into the vault area, where appellant forced one of the victims to open a smaller safe and give him a cash drawer kept within. Appellant then vascillated between walking away and eliminating the only eyewitnesses to the crime, finally deciding to kill the two women. Both were shot from behind, with no sign of struggle or force on their part against the killer.

At 9:53 appellant left the vault area and walked out of the bank, only to return almost immediately to turn off the video camera equipment.

After robbing and cold-bloodedly killing his two female victims, appellant next called the auto dealership to tell them he had the money, then drove to Golden Imports where he gave an employee a large sum of money. He returned to the dealership later with additional funds, and told employees the remainder owed would be forthcoming in a few days. The remainder of this eventful day was spent by running errands, paying various bills, eating at a McDonald's restaurant and driving his wife and children to a canal where he dumped the now empty cash box into the water.

It is patently clear to the Court that this is not one of those cases where prior violent acts show a definitive pattern of conduct from which one may reasonably presume future violent bad acts. Appellant's is rather a story of one who has a history of theft through defrauding others, albeit to the tune of many thousands of dollars, with no known acts of violence supporting his standard operating procedure. Yet, by his own admission, appellant is a "dead"

shot; when he fires a gun he "shoots to kill." Previously, the Federal Bureau of Investigation termed him "armed and dangerous." And, when "push" came to "shove," appellant dug himself a deeper hole and in an attempt to extricate himself, after apparent full deliberation, snuffed out the lives of two innocent human beings. The record does not reflect that appellant acted under passion or emotion of any type; to the contrary, his detailed planning, execution of the offense and attempted destruction of the evidence tying him to the crime reflects a clear-headed, cold-blooded awareness and dedication to the finality of his plans. Appellant's return to the bank and his stopping of the video equipment underscores the calm, cool air State's witnesses testified he had in the hours following the double murder-robbery.

Both the State and defense brought witnesses who testified as to appellant's "bad" or "good" reputation, respectively. Both sides presented their own psychiatrists who testified according to the same basic hypothetical question, with predictable results. In both instances, the jury was free to accept or reject either party's evidence, and the affirmative responses to the two special issues reflects whose version was accepted. Viewed in the light most favorable to the responses given by the jury, the evidence reflects that appellant is an individual who, from the mid–1960's to the present, has engaged in confidence work, defrauding others. As may be expected, expert testimony in the case focused upon the progression of more serious legal trouble in which appellant has placed himself, from a 1964 federal forgery offense, through 1981 state and federal convictions for theft and credit fraud in which he was categorized as being "armed and dangerous" by federal authorities to the time frame of the instant case, where he was arrested and was out on bail on a felony theft charge and facing yet another theft charge based on the transaction with Golden Imports when he walked into Jefferson Savings and Loan on July 16, 1985. The evidence shows that appellant was approximately fifty years old at the time of the double murder, very proficient with firearms as attested by his prior

work as a security guard and by his own admission; a mature man effectively leading a double life, not lacking in wisdom or experience and fully capable and aware of the decisions he made and the actions he took in response to those decisions. The record is completely devoid of any suggestion that he was acting under duress or domination of others, but was instead merely acting in a progressively anti-social manner. In response to a question posed by the State, Dr. Grigson explained an "anti-social personality disorder" in the following manner:

> Anti-social personality disorder is not an illness nor a sickness. It is simply a means of describing a very small part of the population that has these type characteristics. Those type characteristics, number one, is they don't have a conscience. Number two, they are only interested in their own self-gratification and pleasure. They have a disregard for the rules. They are repeatedly breaking the rules. They con and manipulate, use people. They are again, really only interested in whatever they want, their own pleasure.

Dr. Grigson's opinion, based upon the hypothetical discussed *ante*, was that appellant will present "a continuing threat to whatever society he may be in, that he is extremely dangerous."

To rebut the State's expert witness, the defense called Dr. Houston to the stand. Dr. Houston was given the same basic fact situation but stated that he could provide no opinion without first examining the particular individual. Thus, the defense strategy was obviously to call into question the opinion of Dr. Grigson, a "professional expert" who by his own testimony was shown to have testified over 1200 times in court. That strategy just as obviously failed with the return of the jury's affirmative response to the special punishment issues.

We are, as was earlier stated, confronted with a situation where the jury effectively assured assessment of the ultimate sentence to a defendant lacking a definitive prior violent criminal history, with the possible exception of the federal government's

labeling him as "armed and dangerous" in an earlier criminal case. In making its responses the panel was also confronted with conflicting testimony as to appellant's character and reputation; including an executive officer of Jefferson Savings and Loan, who knew appellant while he worked as a security guard at the institution, and a jailer at the Jefferson County Detention Center, who testified as to appellant's quiet behavior while incarcerated on the instant offense. Further mitigating evidence of a more personal nature was foreclosed by appellant's decision to keep his family out of the instant prosecution.

In *Huffman v. State*, supra, a majority of this Court recently found the evidence insufficient to support the affirmative response to special issue number 2 returned by the jury. The victim in the case had been beaten and strangled by a 22 year old man. Even given the brutal facts of the crime itself, this Court reformed the sentence to life, finding as mitigating against affirming the imposition of the death penalty many factors, including that appellant's age, I.Q., early family situation, incidents of drug and alcohol abuse including on the date of the murder, emotional state on that date, lack of violent prior criminal record, and lack of *any* psychiatric or reputation evidence supporting an affirmative answer to the second penalty issue.

In finding the circumstances of the crime to be insufficient in and of themselves to support a death sentence, Presiding Judge Onion recalled the analytic litmus test put forward in *Roney v. State*, 632 S.W.2d 598 (Tex.Cr.App.1982) where the court wrote:

Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a 'calculated and cold-blooded crime,' such as appeared in *O'Bryan v. State*, 591 S.W.2d 464, 480 [ (Tex.Cr.App.1979) ], where the defendant for months planned the candy poisoning of his own child to collect life insurance. To support a 'yes' answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a *continuing* threat to society. To hold that the facts of *this* offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty. Such a construction would destroy the purpose of the punishment stage in capital murder cases, which is to provide a reasonable and controlled decision on whether the death penalty should be imposed, and to guard against its capricious and arbitrary imposition. *Jurek v. State*, 522 S.W.2d 934 [ (Tex.Cr.App.1975) ]; *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 [ (1976) ].

*Huffman*, supra at 223, 224, citing *Roney v. State*, 632 S.W.2d at 603.

The instant prosecution provides a much stronger case for imposition of the death penalty than in *Huffman*, supra. The record reflects that appellant was aware of the consequences of his legal and financial plight, and had promised restitution on the day of the double murder. His planning and strategy demonstrate a "calculated and cold-blooded crime," see *O'Bryan v. State*, supra, from his personal knowledge of the workings of the bank, his choice of method in the initial crime of robbery of carrying "backup" firepower together with no attempt to disguise himself, his calm and deliberate air before and after the robbery-murders, and the nature of the unprovoked, deliberate act of killing not one, but two defenseless victims underscores the severe circumstances surrounding the crime itself. See *Santana v. State*, supra. Cf. *Roney v. State; Garcia v. State*, both supra. Moreover, given appellant's conduct in the days preceding and hours following the crime, Dr. Grigson's opinion as to appellant's psychological profile and his progressionally more violent criminal acts would appear to be supported by the record. Certainly, appellant was well aware of the totality of his difficulties and the escalating level of trouble in which he found himself, but his actions following the killings were even more bizarre given his level of intelligence. After shooting his

two victims he was concerned more about the video camera than the two women, one of which the record reflects was not immediately killed when shot. Then appellant began running errands and paying off bills, stopping to eat lunch at McDonalds. The immediate event simply appears to have had no effect on him. Finally, given his prior promises to Golden Imports, his promise on July 16th to pay off the remainder of the debt in the near future provides another insight into appellant's future behavior, given the fact that he was unemployed with no other visible source of income.

The jury was free to accept or reject Dr. Grigson's analysis of appellant's conduct and what patterns of anti-social behavior were demonstrated. Furthermore, there was no evidence at all to show this progressive pattern of conduct was due to any emotional or pathological problem, as might be expected of another who incurred fraudulent indebtedness. Moreover, there was some definite indication that appellant would again commit at least robbery in order to satisfy his creditors.

Given all the evidence in the record before the Court, and observing the rule stated in *Cannon v. State,* 691 S.W.2d 664 (Tex.Cr.App.1985) that each death penalty case must be decided on its own merit, we are constrained to hold the evidence adduced at trial supports the affirmative response to the second interrogatory. Appellant's final point of error is overruled.

The judgment is affirmed.

TEAGUE, J., concurs in the result.

CLINTON, J., dissents to disposition of point of error five.

CAMPBELL, J., not participating.