NO. 07-95-0197-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

JANUARY 28, 1997

_____

DEREK ANDRIE HAGGERTY, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

_____

FROM THE CRIMINAL DISTRICT COURT NO. 2 OF DALLAS COUNTY;

NO. F-95-00449-JI; HONORABLE LARRY W. BARAKA, JUDGE

_____

Before DODSON and QUINN, JJ., and REYNOLDS, S.J.[*]

Convicted by a jury of capital murder, for which automatic punishment of life imprisonment was imposed,[1] appellant Derek Andrie Haggerty presents five points of error, seeking a reversal and an acquittal or, alternatively, a new trial or, in the alternative, an abatement and remand. We will affirm.

_____

[*]Charles L. Reynolds, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp. 1996).

[1]Imposition of a life sentence for a capital offense where the death penalty is not sought is provided for in section 12.31 of the Texas Penal Code Annotated (Vernon 1994).

By his points of error, appellant contends he is entitled to a reversal and an acquittal because (5) the evidence was not legally sufficient to support the verdict and judgment. Alternatively, he contends he is entitled to a reversal and remand for a new trial because (1) he was deprived of his right to effective assistance of counsel; the trial judge (2) intimidated a State's witness so as to cause the witness to change his testimony, thereby depriving him, appellant, of due process; (3) improperly commented on the testimony of the State's firearms expert; and (4) erred in failing to enter written findings of fact and conclusions of law as to the voluntariness of his oral confession. As an alternative to his fourth-point contention, appellant asserts that the appeal should be abated and the cause remanded to allow the trial judge to make findings of fact and conclusions of law as to the voluntariness of his oral confession.

In presenting his fifth-point contention that the evidence was insufficient to support his conviction, appellant specifically challenges the legal sufficiency of the evidence under the standard of review announced in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to prove that he was at the scene and committed the offense. We, therefore, must view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found these essential elements of the crime beyond a reasonable doubt. Id. at 319.

-2-

Undertaking a review of the evidence, we do not reevaluate the truthfulness or probative value of the evidence. Fernandez v. State, 805 S.W.2d 451, 456 (Tex.Cr.App. 1991). Rather, we accord deference to the jury's right to believe or reject all or some portion of the testimony of each witness, including appellant. Gipson v. State, 819 S.W.2d 890, 892 (Tex.App.--Dallas 1991), aff'd, 844 S.W.2d 738 (Tex.Cr.App. 1992).

The record evidence reveals that on 27 February 1994, appellant was not of age to purchase a firearm, but felt he needed one because of threats to and attempts on his life by others. With the aid of Bobby McKinley, who purchased the firearm at appellant's request, appellant obtained a Cobra model M-12 .380 caliber pistol (the M-12) one day prior to the imposition of the waiting period for the purchase of firearms.

Patsy Scott testified that on 3 March 1994, she and her husband, Robert (Bob) Scott, the victim, had been shopping for a fish-fry party to be given at their home. Although they had been out of town, news reports made the Scotts aware of recent driveway robberies. As they drove toward their home at 8:30 p.m., Bob asked Patsy to look behind to see if anyone was following them.

A two-toned pick-up truck was following the Scotts, but as they turned into their residential neighborhood, the street curved, and Patsy no longer saw the truck. When shown the State's

photograph of a brown and beige two-toned Chevrolet truck, she identified it as being similar to the one she saw.

When the Scotts pulled into the alley entrance of their home, and before they could retrieve their packages from the trunk of the car, a young black man, nicely dressed and wearing a brown leather bomber jacket, approached Patsy on the passenger's side of the car. He grabbed her around the neck, stood behind her, poked a gun in the side of her face, and said, "Give me them rings," as he tugged on her left hand. Patsy gave him her watch and the three rings she was wearing, viz., a gold wedding band, a solitaire with a diamond guard, and a diamond dinner ring.

Bob ran into the alley and screamed for help. As the robber left Patsy and walked toward Bob, Patsy advised, "Give him your rings. We don't care." Bob took off his jewelry and handed it to the robber. As he did so, the magazine clip fell out of the gun the robber was holding and the ammunition scattered along the alley. The robber picked up the clip and some of the bullets and began "charging towards" Bob saying, "You're trying to mess me up," and shot him once in the head. Bob died the following day as a result of his wound.

Patsy identified the M-12 as being similar to the gun the robber used to kill her husband. Although she was unable to identify appellant from either photographic or live lineups, her description of the attacker produced drawn pictures which resembled

-4-

appellant from both her daughter and a police sketch artist. Despite Patsy's inability to identify the attacker with complete certainty, when her recollections were compared to appellant in open court, his features were not different.

Lannie Emanuel, a ballistics expert, testified that the cartridge casing found in the Scott's alley was consistent with the magazine on the M-12.[2] He stated that the casing was fired from the M-12 "to the exclusion of all other weapons."

Derrick Patterson, appellant's friend since childhood, testified that he pawned a ring at appellant's request. Appellant gave him a ring, and after he pawned it for $530, he watched appellant give part of the proceeds to his companion Ricky Beasley.[3] The ring was retrieved from the pawn shop and introduced into evidence as Patsy's diamond dinner ring.

Patterson confirmed that the State's photograph of the brown and beige two-toned pick-up truck was a picture of the truck which belonged to appellant's father, and was primarily driven by appellant since his vehicle was not running properly. Patterson

---

[2]Bruce Adams, crime scene officer for the City of Dallas, defined "casings" for the jury as "the brass part of a bullet. In a semi-automatic weapon or automatic weapon, the brass -- the bullet goes through the barrel and then it ejects the brass end out of the gun." He testified that only one casing and several rounds of live ammunition, but no bullets, were recovered at the scene.

[3]References to Beasley are to Ricky Beasly, Ricky Beasley and Rickie Beasley, as he is variously referred to in the record.

had been an occupant of the truck many times since February 27, and had frequently seen the M-12 in the truck.

Tracy Patterson, Derrick Patterson's sister and also a friend of appellant's, testified that she too pawned some rings for appellant. Appellant paid her $10 for pawning two rings. When she asked for more money, he told her he "had to split the money with his partner," and refused her request.

Several days after Bob Scott's murder, police officers looking for Beasley pulled over a brown and beige two-toned pick-up truck driven by appellant, and later determined to be registered to appellant's father. When Beasley exited the vehicle, officer G. Francis handcuffed him and took him into custody on parole violation charges. Through the open door of the pick-up, Francis saw the M-12, with the clip in, on the floor and yelled the warning "gun" to his partner, Alejandro Villerreal. For safety, Villerreal conducted a pat-down search of appellant and the second passenger, Beasley's brother.

The search of appellant revealed a second magazine clip compatible with the M-12, and a bag of marihuana. Appellant was arrested on drug-related charges.

Homicide Detective Jerry King testified that after appellant was released from custody on the marihuana charge, he was rearrested and placed in an interrogation room. When the detective

entered to talk with appellant, he saw appellant standing on a table directly beneath a hole in the ceiling with a piece of ceiling molding in his hand. Appellant does not dispute that while left alone in an interrogation room, he bored a hole in the ceiling; however, he testified that he did not try to get out through the hole, he merely bored it open.[4]

While in police custody, appellant participated in a lineup with several other men, including Jerome Hall and Tashambry Rodney Hollins. Hollins testified that appellant piqued their curiosity because

> the majority of the individuals, we was -- already had been currently incarcerated at the Government Center. So he [appellant] was the only one that was loose. So we started asking him what he was in here for. And he asked us, didn't we know. Didn't we see him on television. And I told him no.

Conversing with the group, appellant inquired whether anyone had "ever killed a white man before." Jerome Hall offered the only response, a negative one.

Appellant described for Hollins in some detail his encounter with the victim's wife, relating that he had put a gun to "the bitch's head" and asked her to "turn over some rings." On three occasions, Hollins directly asked appellant if he "committed this crime." Appellant's first response was silence, then he claimed he

---

[4]Detective King also testified that an attempted escape charge was pending against appellant for his conduct.

did not know and, finally, he said he did. There was no question in Hollins's mind that appellant murdered a white man.

Stacy Whetstone and her sister, Tracy Whetstone, who dated Beasley for ten years, placed the arrival of Beasley and appellant in a brown and beige truck at their apartment in the vicinity of 10 p.m. on the day of the murder. Stacy said that three or four days after the murder of Bob Scott, she saw Beasley and appellant in a beige and brown pick-up truck, driven by appellant, at a drive-in restaurant. She asked the two men if they were "the ones that killed that guy, Mr. Scott. And . . . why did they have to do it." Beasley replied, "I don't know. That is just the way it went." Appellant responded, "Yeah man, I did."

Testifying on behalf of appellant, Vanessa Littleton said that appellant was at a "bar-b-que" at her home almost every night until March 10; however, she admitted that appellant normally would come in the daytime, leave, and then return after her boyfriend left. She was not positive about the night of 3 March 1994, and could not account for appellant's whereabouts at the time of Scott's murder.

Admitting that he caused McKinley to buy the M-12 for him, appellant testified he gave the gun to Beasley to keep. He stated he was with "Vanessa"[5] the night of the shooting between 6:00 p.m. and 5 a.m. the following morning, because Beasley had taken his

---

[5]Although appellant was unsure of Vanessa's last name, she was the Vanessa Lavon Littleton who testified on appellant's behalf.

father's truck and, failing to return as agreed, returned instead the following morning. He said that when he was questioned by Detective Bobby Hammer, he told Hammer that he did not kill Scott. He denied ever meeting Stacy or Tracy Whetstone and telling Hollins or Whetstone that he killed Scott.

In rebuttal, the State marshalled testimony from Glenda Conn and Debra Hart as signature extraneous offenses by appellant in the attempted robbery and robbery of their respective jewelry.[6] Both women positively identified appellant in live lineups near the time of the offenses and in open court as the malefactor of the offenses against them.

Conn testified that on 19 January 1994, after pulling into the alley entry of her home, she began gathering office files from the car seat. When she looked up, a young, nicely dressed, nice looking, black man was standing at her car door. He put a small gun to her head, and as he demanded her rings, he tugged on her left hand. Conn resisted by tightly gripping the steering wheel and repeatedly blowing the horn of her car. The man put the gun away and began "grappling" with her hands. Unable to get her rings, he ran away.

---

[6]Prior to Conn's and Hart's testimony before the jury, the court conducted a hearing outside their presence to determine the relevance of the evidence, and no complaint is made against the admission of this evidence. <u>See</u> Tex. R. Crim. Evid. 404.

Hart testified that on 27 February 1994, she and her husband returned home from a church meeting and pulled into the alley entrance of their home. As she was gathering her things from the floor of the car, she heard voices. When she looked up, she saw a young, nicely dressed, black man holding a gun on her husband, and saw her husband drop to his knees. Although she could not hear what was being said at that point, she testified that she later determined her husband was praying. Then, the robber came to the passenger-side of the car where she was sitting, opened the door, took her purse, and said, "Give me those rings." Hart complied and, at the robber's request, also gave him the car telephone. Hart identified appellant as the robber and the M-12 as the gun used in the robbery.

The police retrieved Hart's jewelry from a pawn shop. The pawn ticket was signed, "Derek Haggerty."

The State recalled Detective Hammer, whose testimony of a statement made to him by appellant on March 25 was admitted for purposes of impeachment. According to the detective, appellant stated that he had been present during the Scott murder, but stayed outside the garage. Appellant said that Beasley confronted the Scotts, took her jewelry and shot Scott. He told Hammer that if Mrs. Scott could identify him, it was only from when he ran to pick up the magazine which had dropped to the ground. Hammer reported

that appellant never said he was at Vanessa's at the time of the murder.

Again testifying, appellant said that on March 25 Hammer told him he had been identified by fingerprints on soda cans near the crime, that Hammer would recommend the death penalty, and that Mrs. Scott could identify him. He knew Hammer was not serious because he was not at the scene and knew his fingerprints were not there. He told Hammer he did not see the offense. He requested Hammer get his lawyer, but Hammer refused, telling him he did not need to waste his hard-earned money on an attorney. Appellant stated he was kept for three hours while Hammer tried to get him to "sign his life away," and then he was handcuffed at the wrists and ankles and told to lay on the floor. He admitted pawning the rings taken from Hart, but said he got the rings from Beasley.

The jury, disbelieving the evidence of appellant's alibi and apparent implication of Beasley as a solitary actor in the robbery and murder of Bob Scott, as it was entitled to do, Russeau v. State, 785 S.W.2d 387, 391 (Tex.Cr.App. 1990), found appellant guilty of capital murder.[7] Considering the evidence placing appellant at and connecting him with the scene, i.e., the similarity of his features with those of the man Patsy recollected as the man who killed her husband both in the sketches and

_____

[7]The jury was charged on the law of parties and on conspiracy to commit a felony.

-11-

comparisons in open court; the positive identification of him as the man who committed similar acts, Montgomery v. State, 810 S.W.2d 372, 387 (Tex.Cr.App. 1991); his possession of the murder weapon, Madden v. State, 799 S.W.2d 683, 691-92 (Tex.Cr.App. 1990), cert. denied, 499 U.S. 954, 111 S.Ct. 2912, 130 L.Ed.2d 1078 (1995); his possession of the stolen jewelry, see Price v. State, 902 S.W.2d 677, 680 (Tex.App.--Amarillo 1995, no pet'n); and his confessions to Hollins and Stacy Whetstone, Fisher v. State, 851 S.W.2d 298, 304 (Tex.Cr.App. 1993), in the light most favorable to the jury's verdict, any rational trier of fact could have found the State proved appellant's identity as the miscreant who committed the charged offense.  Additionally, his attempted flight from custody was probative of his guilt.  Fentis v. State, 582 S.W.2d 779, 781 (Tex.Cr.App. 1976).  His fifth point of error is overruled.[8]

Appellant contends by his second point of error that the trial court intimidated Bobby McKinley so as to cause him to change his testimony.  In so contending, he asserts that the trial court's statements transcended the standards for admonitions stated in Davis v. State, 831 S.W.2d 426 (Tex.App.--Austin 1992, pet'n ref'd), one of which is that under certain circumstances, a judge's intimidation that persuades a witness to change his testimony may infringe a defendant's due process rights.  Id. at 437.

---

[8]Appellant has not challenged the factual sufficiency of the evidence to support his conviction.

The alleged intimidation and change of testimony arose in connection with McKinley's testimony that when he told appellant he would report the gun stolen if he did not get it back, because it was his gun and he did not want to be blamed if something happened, appellant said he "had let somebody use the gun, and they had used it in something." McKinley added that appellant said, "[S]omebody used it. He didn't say he done it. He said somebody done it," and he said, "Don't report the gun stolen." When the prosecutor asked "was he [appellant] begging you to not report the gun stolen," McKinley replied, "He just said, 'Don't report the gun stolen.' He didn't say -- beg."

At that point McKinley identified a statement he had given to the police, and affirmed that he recalled reading it and signing it. He also affirmed that the police read the statement to him and he understood what they were reading. The statement, which was later admitted into evidence, contained these declarations: "Derek said don't report the gun stolen cause they used the gun in a shooting. He was begging me not to report it."

When the prosecutor next inquired whether he told the police what happened, McKinley answered, "I told them what I said. I don't know what they wrote down." Yet, he acknowledged that he signed the paper.

The prosecutor allowed McKinley to refresh his memory with the written statement he provided the police. Then, when the

-13-

prosecutor asked McKinley if he recalled ever telling the police anything about appellant begging him not to report it stolen, McKinley replied, "No. He didn't beg me. He just said, 'Don't report it stolen.' You get on your knees begging. He wasn't doing all that. He was standing on the side of me talking."

Then, when an unrelated question was answered "No" by McKinley, and the prosecutor requested him to refresh his memory, the trial judge interrupted the proceedings, excused the jury and, as pertinent to appellant's contention, said to McKinley, "I'm going to give you an opportunity to read that statement that you made, that you said you signed." Thereafter, the following exchange between the court and McKinley was recorded:

> THE COURT: I wish for you to speak the truth and only the truth of what you're saying. No more hemming and hawing or fudging. Do you understand me?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: Because you're going to have a problem on your hands.
>
> THE WITNESS: They [the police] read [the statement] to me, I signed. That's what I said. What more can I say?
>
> THE COURT: That's the point that he was trying to get you to understand. You read it. You didn't have any complaint against it, and you signed it after hearing that?
>
> THE WITNESS: Yeah. But he didn't beg me. That's what I'm telling him. He came by. I told him that. But I didn't' say he begged me. Begging is when you're on your knees.

THE COURT:  That's neither here nor there for me. What I'm trying to tell you --

THE WITNESS:  I signed it.  This is what I said.

THE COURT:  I'm not going to talk over you.  All I want you to recognize, there's something called perjury. It's a third degree felony, two to ten years in the penitentiary and up to a $10,000.00 fine.  As long as you understand what's what.

You're under oath.  You do whatever you think is best.  But I just want you to understand that.  The truth is what we're going to have here today.

Do you understand what I'm saying?

THE WITNESS:  (Witness nods.)

THE COURT:  I'm going to give you an opportunity to read that statement in its entirety.

THE WITNESS:  This is what I said.  I'm through with it.  This is what I said.  I signed it.  That's that.

Appellant objected that "intimidation of the Court to this witness amounts to an indirect comment on his credibility," prefacing his objection with this comment:  "Now, if there's inconsistency in the document, it's up to the jury to decide."  The court overruled the objection, remarking that the witness "seems to be hemming and hawing about statements that he says he made, that he didn't make."

When the examination of McKinley about his statement continued in the presence of the jury, the prosecutor asked, and McKinley answered, as follows:

Q.  Is the truth everything in that statement (sic)?

A.  I signed it.  If I had wrote it, maybe, I could have said it's true.  That's just my signature.

-15-

Q.   Is it true in the statement or not, yes or no?

A.   No.  Some of it is, some of it ain't.

The question whether appellant "begged" McKinley not to report the gun stolen was not asked in this examination.

On appeal, appellant asserts that the trial judge intimidated the witness into changing his testimony in that before the judge's remarks, the witness did not state he, appellant, was involved in the shooting; but, after the remarks, the witness said he gave the written statement and that it was true, and "thereby through the language in the statement said Appellant told him he was involved in the shooting." Without enlightenment by quoting the language in the statement which qualifies as telling McKinley that appellant was involved in the shooting, appellant concludes that he was denied due process by the trial judge.

Preliminarily, it is observed that the variance from the objection made at trial to the error contended for on appeal probably has failed to preserved anything for our review. See Rezac v. State, 782 S.W.2d 869, 870 (Tex.Cr.App. 1990). And it is permissible for a trial judge to admonish a witness of the penalty for perjury when the witness, as in this prosecution, has denied the truthfulness of a prior statement. Webb v. State, 503 S.W.2d 799, 801 (Tex.Cr.App. 1974).

Secondarily, appellant misinterprets the wording of McKinley's statement in expressing that "thereby through the language in the statement said Appellant told him he was involved in the shooting." Other than the declaration that "[h]e was begging me not to report it," there is nothing in McKinley's statement that is at variance with his testimony, and particularly nothing in the statement logically leads to the conclusion that appellant told McKinley that he was involved in the shooting. Thus, unlike the situation in Davis, upon which appellant relies, McKinley did not change his testimony as a result of the trial judge's admonition so as to infringe appellant's due process rights. The second point of error is overruled.

Appellant's third-point contention is that the trial court improperly commented upon the testimony of Lannie Emanuel, the ballistics expert who, having run tests on the cartridge casings found in the Scott's alley as compared to casings known to be from the M-12 purchased for appellant, opined the spent casing and the live ammunition were consistent with the magazine on the M-12 and "were produced on the same equipment or machine" as the ammunition found in the clip of the M-12. More emphatically, he stated that the casing found at the scene was fired from the M-12 "to the exclusion of all other weapons."

During his cross-examination on the subject by appellant's counsel, the following is shown of record:

-17-

Q.    Now, one of your -- what you're supposed to do with that weapon was to see whether it could have fired the bullet or the cartridge that produced that casing?

A.    The cartridge case?

Q.    Yes.

A.    I never got the bullet as evidence.

Q.    Okay.  The casing.

A.    The cartridge case, yes.

Q.    And you were also to determine --

The trial court interrupted with these remarks:

Say, look, look.  Now, this gentleman has testified as to testing and results.  Now, that speaks for itself as to what he was intending to do.  Do you have a question that's pertinent and relevant to what you're doing?  It just seems like you're going over testimony that we have gone over before, again.

After some discussion whether the questions had been asked and answered, the court queried Emanuel whether he did "anything different or anything else that you didn't testify to?" and Emanuel responded, "We haven't testified to the results of the other weapon that was submitted.  And there was a comparison between cartridges from the magazine and -- that were submitted later. . . ."

Defense counsel requested, and was granted, permission to make an objection outside the presence of the jury, and then, upon being asked by the court whether he had any new questions, counsel replied in the negative.  After further redirect and recross-

-18-

examination of the witness, the jury was excused and defense counsel informed the court:

> My objection is this, Your Honor.  I believe, your Honor is indirectly coming into (sic) the weight of evidence in this case.  Specifically, you said that the results speak for itself.
>
> Now, to me, that would suggest to the jury that this is closed.  I believe that that's very harmful.  And that's the basis of my objection.

The court overruled the objection, explaining that the "Court was referring to you repeating questions, soliciting the same testimony from this witness."

Appellant argues that the judge's comments were improper because they bore on the weight of the evidence, which is prohibited by statute.  See Tex. Code Crim. Proc. Ann. art. 38.05 (Vernon 1979).  Prejudice resulted to him, appellant says, because the judge's comments suggested to the jury that the critical issue--viz., whether he was present when the offense was committed and shot the fatal bullet--was closed, since the witness Emanuel's testimony that the cartridge case at the scene was fired from the gun in his possession when he was arrested put him in possession of the murder weapon, a circumstance bearing on his guilt.  Moreover, appellant suggests, the judge's comments must be viewed in light of these statements by the judge to the jury panel:

> Let me explain to you, so we'll understand each other, where I'm coming from when I say this.  I'm a Republican.  Conservative.  I'm considered the hanging

-19-

> judge in Dallas County. I'm considered the meanest
> S.O.B. in the valley, folks. I give time like it's
> lunch. I believe in strong law enforcement and the
> police. . . .

These statements, appellant proposes, indicate the judge's predisposition to expecting what the police and law enforcement in general say as being fact, and were a strong and clear message to the jury as to the believability and the credibility of law enforcement officers and the police.

Of course, it is well established that a trial judge should studiously avoid making any remark calculated to convey to the jury his opinion of the case of any fact issue raised by the evidence. McClory v. Sate, 510 S.W.2d 932, 934 (Tex.Cr.App. 1974). This obtains because article 38.05, supra, is a clear mandate that trial courts shall not comment upon the weight of the evidence or in any way infer to the jury the court's opinion of any fact issues before the jury for resolution. However, for such a violation to constitute reversible error, the comment must be such that it is reasonably calculated to benefit the State or prejudice the rights of appellant. Howard v. State, 420 S.W.2d 706, 707 (Tex.Cr.App. 1967).

At the outset, we observe that the trial judge's quoted statements to the jury panel occurred approximately one-fifth of the way through his opening remarks covering 57 pages in the statement of facts. Taken in context, the statements were a minute

part of the judge's opening ruminations on a variety of subjects, including, but not limited to, courtesy and hospitality, bias and prejudice, his childhood and some family history, the difficulties and rewards of his judgeship, and the judicial system and the responsibilities of citizens serving as jurors, as well as his opinion of the mentality of state legislators. And contrary to appellant's proposal that the judge's quoted comments were a strong and clear message to the jury panel of his belief in the believability and credibility of law enforcement officers and the police and their testimony of facts, the judge later told the panel:

> And, in the pool of humankind, let's face it, we've got people who lie. We have judges who lie. Police officers who lie. Priests and nuns who lie. And we can all agree that presidents and presidential candidates, they're going to lie.
>
> So the law says simply because you have a particular job or a profession, you are not endowed with any great truth-telling ability, and your credibility must be judged by the same standard as everybody else.

Given the totality of the trial judge's unconventional address to the jury panel, see, e.g., Texas Rules of Civil Procedure 226a; Walker v. State, 440 S.W.2d 653, 658 (Tex.Cr.App. 1969), we have no hesitancy in deeming it highly unlikely that jurors associated the trial judge's remarks selected by appellant with his comments regarding Emanuel's testimony. We, therefore, ignore the quoted statements in resolving appellant's contention.

-21-

On close inspection, it is apparent that the interruptive comments by the trial judge did not convey to the jury an opinion of the verity of Emanuel's testimony; instead, it is as apparent that the judge was concerned with, and desired to avoid, time-consuming repetition of questions previously asked and answered. Indeed, the trial court invited defense counsel to ask pertinent and relevant questions. When, as here, a trial judge, was understandably concerned with the proper conduct of the trial and cut off what the judge perceived to be a repetitive line of questioning, there was no error in doing so. White v. State, 601 S.W.2d 364, 367 (Tex.Cr.App. 1980). Appellant's third point of error is overruled.

Appellant presents his fourth point to contend for an abatement of this appeal to allow the trial court to enter findings of fact and conclusions of law regarding the voluntariness of the March 25 oral statement he purportedly made to officer Bobby Hammer. The record reveals that mid-trial, the court held a hearing in the absence of the jury on the admissibility of Hammer's testimony of the statement for the purposes of rebutting appellant's alibi defense and for impeachment.

Hammer testified that appellant was advised of his constitutional rights, appeared to understand them, and was not made any promises to make, or coerced into making, the oral statement. Appellant cross-examined Hammer, but he did not testify

-22-

at the hearing.  Appellant concedes that although his trial counsel made objections to the admissibility of the statement, no issue was raised as to the voluntariness of the statement.  The trial court ruled that the statement was admissible for purposes of impeachment without making any findings of fact or conclusions of law.  Nor, appellant also concedes, was any objection made to the voluntariness of the statement when Hammer testified to it on rebuttal.

Nevertheless, on appeal, appellant asserts in view of his account that Hammer threatened him with the death penalty and denied him the right to see his attorney, and that he was handcuffed and made to lay face down on the floor, he does not know whether the trial judge was conducting the sub rosa hearing on the issue of voluntariness.  Therefore, appellant submits, without findings of fact and conclusions of law, he cannot be accorded his right to a full and fair review of his conviction.

Aside from the fact that appellant denied he made the statement attributed to him by Hammer, he never raised the issue of voluntariness until it was presented on appeal.  If appellant desired to contest the voluntariness of the statement, it was incumbent upon him to object for that reason not later than when it was used for impeachment.  By waiting until the appeal, he waived his right to a hearing on the voluntariness of the statement.  Ross v. State, 678 S.W.2d 491, 493 (Tex.Cr.App. 1984); Lindley v. State,

-23-

635 S.W.2d 541, 544-45 (Tex.Cr.App. 1982). Appellant's fourth point of error is overruled.

Initially, appellant contends he was denied his right to effective assistance of trial counsel, naming two specific instances of omissions coupled with a general complaint that the totality of his trial representation demonstrated improper representation. Since all of the complaints are directed to trial counsel's performance at the guilt-innocence phase of the trial, the test by which appellant's contention is determined is whether he showed that (1) counsel's representation fell below an objective standard of reasonableness, and that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Hernandez v. State, 726 S.W.2d 53, 55 (Tex.Cr.App. 1986) (following in full the standards spelled out in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).

The determination of appellant's contention begins with the presumption that trial counsel's conduct comported with reasonable, professional assistance. Then, to sustain his challenge to counsel's conduct, appellant must overcome the presumption that the conduct might be considered sound trial strategy, Jackson v. State, 877 S.W.2d 768, 771 (Tex.Cr.App. 1994), by showing his allegations of ineffective representation are firmly founded. Mercado v. State, 615 S.W.2d 225, 228 (Tex.Cr.App. 1981). In this connection,

a cold trial record, recording the focus on the issues of guilt or innocence and punishment and not on the conduct of trial counsel, generally is deemed insufficient to gauge claims of ineffective assistance of counsel in light of the strong presumption that counsel's performance falls within the wide range of reasonable professional assistance. Jackson v. State, 877 S.W.2d 768, 772 (Tex.Cr.App. 1994) (Baird, J., concurring).

Still, appellant attempts to show ineffective assistance of trial counsel by first faulting him for failing, as previously noted, to raise the issue of the voluntariness of his oral confession to Detective Hammer, the statement Hammer said appellant made on March 25. In doing so, appellant cites the record to show his testimony "that prior to making the statement the Detective threatened him with the death penalty, refused to let him talk with his attorney, and handcuffed him and laid him on the floor face down." Appellant misperceives the record. He did not preface his testimony of the detective's action with "prior to making the statement"; instead, he denied making the statement Hammer attributed to him, and said that when Hammer tried to get him to make a statement, "I just sat there."[9]

---

[9]Perhaps appellant's present claim of making an "oral confession" arises from the fact that during his testimony, he identified a written statement he gave on March 21, which both he and the State introduced into evidence.

Confronted with appellant's denial of making the statement, trial counsel may have deemed it incongruous trial strategy to challenge the voluntariness of a statement his client denied making. In any event, with nothing in the record to affirmatively show why counsel did not raise the issue of voluntariness, the presumption that counsel rendered reasonable professional assistance in this instance is not overcome. Id. at 771; Delrio v. State, 840 S.W.2d 443, 447 (Tex.Cr.App. 1992).

Second, appellant charges his trial counsel with failure to object to the admission of McKinley's written statement and to request a charge limiting the jury's consideration to the issue of credibility. He asserts that albeit McKinley originally was somewhat evasive about the contents of his statement, after the hearing before the trial judge, he unequivocally admitted signing the statement and making the statements therein. He relies on the Texas Rules of Criminal Evidence 612(a) provision that where the witness admits making a prior statement, "extrinsic evidence of same shall not be admitted," and the holding in McGary v. State, 750 S.W.2d 782, 786 (Tex.Cr.App. 1988), that if the witness unqualifiedly admits making the prior inconsistent statement, the admission of the statement into evidence is precluded. And without citation of supporting authority, he states his counsel should have requested a limiting instruction once the statement was admitted.

However, the previously recorded initial examination of McKinley, the interjection of the trial judge's comments, and the continued examination of McKinley during which he stated some part of his prior written statement was true and some was not true, clearly revealed that McKinley did not unqualifiedly admit making the inconsistent written statement. Thus, his written statement was properly introduced to impeach him. Id. at 786 n.3; Aranda v. State, 736 S.W.2d 702, 708 (Tex.Cr.App. 1987), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 947 (1988). Furthermore, there being nothing in the record bearing on the reason why trial counsel did not request a limiting instruction other than his in-court statement that it was for the jury to decide whether there was inconsistency in the document, it is not unreasonable to credit the lack of a request for a limiting instruction to trial strategy of avoiding the jury's focus on the statement. Garcia v. State, 887 S.W.2d 862, 881 (Tex.Cr.App. 1994), cert. denied, ___ U.S. ___, 115 S.Ct. 1368, 131 L.Ed.2d 223 (1995); Abbott v. State, 726 S.W.2d 644, 649 (Tex.App.--Amarillo 1987, pet'n ref'd). Consequently, on this record, we cannot say that counsel's omissions rebutted the presumption that he rendered reasonable professional assistance. Jackson v. State, 877 S.W.2d at 771.

Finally, appellant contends that the totality of trial counsel's representation was ineffective for three reasons. They are that (1) he called two witnesses, James Dixon and Jack Parks, and asked them no questions material to the trial; (2) he

continually had difficulty framing objections; and (3) the relationship between the trial judge and counsel rendered the representation ineffective.

Although counsel may not have asked Dixon or Parks material questions, he attempted to elicit from Dixon, who was in jail with appellant, what appellant had told him about his case, but that line of inquiry was foreclosed by a successful objection. Absent a showing that appellant would have benefitted from the witnesses' testimony which counsel failed to adduce, the mere presentation of the witnesses who produced no material testimony does not raise the specter of ineffective assistance of counsel. See Holland v. State, 761 S.W.2d 307, 319 (Tex.Cr.App. 1988), cert. denied, 489 U.S. 1091, 109 S.Ct. 1560, 103 L.Ed.2d 863 (1989).

With respect to appellant's claim that trial counsel continually had difficulty framing objections, the record does evince that the trial judge criticized counsel on occasion for the wording of his objection. And on occasion the judge likewise criticized the prosecutor for his wording of objections. A perusal of the record does not indicate that the judge, albeit freely expressing his disagreement with the wording of the objections, showed antagonism or favoritism toward either to the detriment of the interests each represented.

On those occasions when the judge criticized appellant's trial counsel for the wording of his objections, counsel rephrased his

objections and pursued them to either a favorable or adverse ruling. Appellant's bare claim of his counsel's difficulty in framing objections, without more, offers only mere speculation that counsel was ineffective for that reason. Obviously, the record lends no support for that holding. Jackson v. State, 877 S.W.2d at 771.

Appellant's claim that the relationship between the trial judge and his trial counsel rendered counsel ineffective is predicated upon the judge's initial remarks to the jury panel and selected actions of counsel. Appellant points out that the judge told the jury panel that defense counsel "happens to be a very close personal friend of mine," but that "you-all will probably think before the trial is over if things work like they normally work, you'll think I hate [defense counsel] by the time we're done because I'm on him." And that, "My attitude is, I treat everybody in here the same. In fact, not only -- it's not an added advantage becoming friends with me. It's probably a disadvantage because I'm going to bend over backwards not to show you favoritism. [Defense counsel] will know I'll do it to him." However, appellant neglects to note that the judge also added, "It's the same way with [the prosecutor]."

Then, appellant selects instances in the proceedings when the judge criticized counsel as being the "only one who seems confused," for being unclear whether he was asking a new or follow-

up question, for asking questions that were not pertinent or relevant and repetitious, and for trying to solicit information without giving the witness time to read the report in question, together with refusing to allow counsel to make an objection. The criticism, appellant asserts, resulted in counsel stating, "I'll do whatever you want, Judge."

Appellant's assertion that the judge's criticism resulted in counsel stating he would do whatever the judge wanted is an unwarranted conclusion drawn from the premise of criticism. In fact, counsel's statement followed the choice offered him by the judge to present reports "now . . . [or] hold them over until Monday," to a witness, who stated he could only answer counsel's questions by replying, "I don't know," without benefit of the reports. And, in context, counsel's statement was a mere offer to proceed as the judge desired.

Beyond that, the judge's criticism was but a fulfillment of his prophecy to bend over backward not to show favoritism by being "on" counsel, who, in the judge's words, "will know that I'll do it to him." But, more importantly, appellant has not suggested how the criticism, as well as the totality of counsel's representation, evinced counsel's inability to properly represent him. The adequacy of counsel's representation must be gauged by the totality of the representation, Ex parte Perkins, 706 S.W.2d 320, 323 (Tex.Cr.App. 1986); and, in this regard, it does not escape notice

-30-

that counsel vigorously cross-examined the State's witnesses, called witnesses of whom he asked pertinent, well articulated questions, and elicited testimony casting doubt on Patsy's identification of appellant as the man who robbed her and shot her husband, and her identification of the truck she saw following them.  He also elicited testimony concerning appellant's alibi for the time of the shooting and his good character and work ethic.  And, he artfully directed appellant's testimony and offered opportunities for rehabilitation on re-direct examinations.

Taking into account that appellant's constitutional right to counsel does not mean errorless counsel where adequacy of representation is argued or judged purely by hindsight, Holland v. State, 761 S.W.2d at 320, appellant has failed to show that his trial counsel's overall performance was deficient and that, but for such deficiencies, there exists a reasonable probability the result of the proceeding would have been different.  Appellant's failure dictates that his first point of error must be overruled, id., and it is overruled.

Accordingly, the judgment is affirmed.


                              Charles L. Reynolds
                              Senior Justice



Do not publish.  Tex. R. App. P. 90(c).