

# NUMBER 13-18-00387-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF H.M.P., MINOR CHILD

**On appeal from the 25th District Court
of Lavaca County, Texas.**

# MEMORANDUM OPINION
**Before Justices Rodriguez, Contreras, and Benavides
Memorandum Opinion by Justice Benavides**

By two issues, appellant MMG, HMP's mother, challenges the termination of her parental rights.[1] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O) (West, Westlaw 2017 through 1st C.S.). MMG argues that the trial court erred by denying her motion to proceed *pro* se at trial and that she was denied effective assistance of counsel. We

---

[1] To protect the identity of the minor child who is the subject of this appeal, we refer to the parties by their initials. *See* TEX. R. APP. P. 9.8; TEX. FAM. CODE ANN. § 109.002(d) (West, Westlaw 2017 through 1st C.S.).

affirm.

## I.    BACKGROUND

In June 2017, the Department of Family and Protective Services (DFPS or the Department) filed an original petition for temporary conservatorship of HMP, for removal of HMP on multiple grounds, and to terminate both parent's rights.[2]    *See id.* § 161.001(b)(1) (C), (D), (E), (K), (N), (O), and (P).

The affidavit in support of the petition advised the court that on April 17, 2017, DFPS received a referral for medical neglect and for neglectful supervision of HMP by MMG.   The affidavit recited the details of the Department's investigation in May 2017 and MMG's history with the Department.[3]   The referral alleged that MMG and her boyfriend smoked methamphetamine, that HMP missed a lot of school because MMG did not get up to take HMP to school, and that HMP who was eight years old was left to her own devices to prepare food when there was food in the house.

HMP attended private school and was enrolled by her cousin Riley on March 17, 2017.   HMP missed twenty days of school between her enrollment and May 8.   At least four times, MMG failed to pick up HMP after school and MMG could not be reached by phone.

The investigator and a Shiner police officer contacted MMG at home on May 8, 2017.   The worker noted that MMG's house was messy with clothing all over the floor and had very little food, although there were two cases of beer in the refrigerator.   The

---

[2] The petition also sought orders as to father BKP, but he did not contest termination of his rights and filed an affidavit relinquishing his parental rights.

[3] The details that follow come from the affidavit filed by the Department's investigator.

2

house had roaches (both live and dead) everywhere. MMG denied she used illegal drugs but refused to take a drug test. MMG's boyfriend CG sometimes spent the night at her house. During the visit MMG called the worker "ignorant," "stupid," and a "bitch." MMG agreed to a safety placement of HMP with Riley. Riley agreed to take HMP. The following week, MMG again refused a drug test.

HMP's aunt Lisa confirmed that HMP spent a lot of time with Riley. Lisa also confirmed that her sister MMG is a drug user who would steal their mother's pain medication if it was not locked up when MMG came to visit. MMG had prior history with the Department.[4]

A show cause hearing was scheduled for June 20, 2017. MMG was represented by court-appointed counsel who announced not ready. The trial court continued HMP's placement with Riley and limited the rights of both parents. DFPS was appointed temporary managing conservator of HMP. MMG was not permitted visitation with HMP. MMG was ordered to comply with the DFPS service plan and the next hearing was scheduled for August 2017.

The home study on Riley was performed with positive results. DFPS prepared a service plan for MMG that required her to participate in a drug/alcohol assessment, submit to random drug screenings, and complete in-patient drug rehabilitation under specified circumstances. In addition, MMG was required to complete a parenting class, maintain

---

[4] MMG had a DFPS history from HMP's birth in 2008. HMP was born prematurely with cocaine in her system. In August 2009, DFPS received a second referral for neglectful supervision. Both MMG and BKP had criminal histories. MMG's history consisted of misdemeanors related to drugs and alcohol as well as driving violations related to drugs and alcohol. During the 2009 DFPS investigation both MMG and BKP tested positive for cocaine. Both were referred for services which they completed, and they remained drug and alcohol free. The case was closed.

safe and stable housing, and provide proof of income to support her family. MMG was required to stay in contact with the DFPS worker monthly, refrain from criminal conduct, comply with conditions of her probation, if any, participate in a psychological evaluation, follow through with medical and mental health needs, and attend and participate in weekly counseling sessions.

Over the months before trial, MMG continued to refuse drug testing and generally failed to complete any portion of her service plan. Two appointed attorneys moved to withdraw because they could not effectively communicate with MMG, and the trial court appointed new counsel each time. The court also appointed a CASA representative for HMP. The trial court ordered MMG to complete a nail scraping test, not to cut her nails until after the test, to undergo drug and alcohol assessment, and to have a psychological evaluation before the next hearing.

Two weeks before the December 2017 hearing, DFPS filed a permanency report with the trial court that described MMG's lack of cooperation and lack of progress on her service plan. The Department was concerned about MMG's housing. The police were called to her residence multiple times on domestic violence complaints or fighting involving MMG's boyfriend CG. The Department was also concerned by CG's criminal record and his time in prison.

In July 2017, MMG tested positive for methamphetamines but tested negative on August 8, 2017. MMG attended two scheduled visitations with HMP. At one visitation, MMG appeared with a black eye and a band aid on her face. DFPS refused visitation on the ground that it was not in HMP's best interest to see her mother in that condition. On other occasions, MMG yelled, screamed, and cursed at staff in HMP's presence.

4

MMG was very late for another visit and arrived yelling and screaming. She refused to speak to the worker or comply with requests and was "spewing cuss words."

At the December 5 hearing the trial court found that MMG had not demonstrated adequate compliance with the service plan and suspended MMG's visitation with HMP. MMG was again ordered to undergo a nail scrape test and psychological evaluation. The next hearing was scheduled for March 13, 2018.

In March 2018, the Department filed a new permanency report that reported that MMG did not attend counseling sessions after October 2017, did not attend parenting classes, and refused to meet with workers in January or February 2018. MMG also refused monthly drug testing requests and did not schedule a psychological or psychiatric evaluation as ordered by the trial court. The Department found that there was reason to believe that at the time HMP was removed from MMG, MMG's supervision of HMP was neglectful and that MMG physically neglected HMP.

The trial court held a permanency hearing on March 13, 2018. MMG appeared with counsel. The trial court found that MMG had not demonstrated adequate compliance with the service plan and ordered MMG to submit to urinalysis on March 16, 2018 and to a joint home visit that date. Trial was scheduled for May 8, 2018.

The joint home visit was rescheduled at MMG's counsel's request to April 9, 2018. That morning counsel requested it be cancelled due to MMG's mother's illness. The CASA volunteer and worker went to MMG's home April 9 for an unannounced visit. MMG refused to allow anyone in the house because her mother was sleeping. MMG spoke to the worker and volunteer through the partially opened front door and refused to come out onto the front porch. The CASA volunteer smelled a strong odor of cigarette

5

smoke and saw an oxygen tank near the open door. There was also an empty vodka bottle in a flower pot by the front door. MMG refused a drug test.

Trial began on May 8, 2018. Counsel for MMG announced not ready and requested a continuance which was denied. Counsel advised the court that MMG appeared for drug testing and the psychological evaluation. MMG's brother and niece were present as prospective witnesses who had no criminal record, no history with DFPS, and who could take care of HMP. Counsel further advised the trial court that MMG had provided the requested release to DFPS for her drug and alcohol assessment, but DFPS claimed not to have received it. In addition, the joint announced home visit had not been rescheduled due to MMG's mother's illness. MMG also requested a jury. The trial court denied the request for continuance and for a jury explaining that the jury demand was nearly two months late and the trial court was not certain it could convene a jury before the June 25, 2018 statutory dismissal date.

The first trial witness was the Department's investigator who filed the original affidavit supporting the original petition. Her testimony was consistent with her affidavit. The next witness was the case worker. Her testimony was consistent with the reports she filed throughout the proceedings. The case worker reported that MMG's most recent drug test, taken in March 2016, was positive for methamphetamines and for a high level of alcohol. Trial resumed on July 11, 2018.

When trial resumed, MMG asked the trial court to allow her to represent herself, requested a continuance, and requested a jury trial.[5] The trial court denied MMG's

_____

[5] The second day of trial, MMG was late. After MMG arrived, counsel advised the trial court:

motion. During the case worker's testimony, the trial court admonished MMG to keep her voice down and then took a brief recess to allow counsel to consult with MMG. During the break MMG left the courthouse and did not return. The remainder of the trial was conducted without her. The case worker testified that HMP was doing well in her placement with Riley. HMP wanted to remain with Riley and be adopted.

Marie Hernandez, Ph.D., evaluated MMG in March 2018. Dr. Hernandez testified that MMG responded to questions with information that was completely implausible, almost delusional. Dr. Hernandez diagnosed MMG in part with factitious disorder and was concerned that without treatment she would not be able to care for herself or for a

---

[MMG] just informed me that at this point, she would like to go ahead and ask the Court to be allowed to represent herself, and she would like to ask for continuance. And she would like to address the Court, and have me, as well, as part of that motion. So I would like to briefly call her.

THE COURT: [MMG], can you tell me briefly why is it you wish not to be represented by Mr. Hille at this time? Because we already had our first day of trial on May the 8th. Today is July the 11th. Why don't you stand up and tell me.

[MMG]: Because I want to — I think I would have a better outcome, honest to God. He's my third lawyer, and I've gotten further by myself personally, than any of my lawyers have. And it's not my first time or anything like that. I want to pay for a jury trial, if that's possible, and do everything myself. I want to represent myself.
 . . .

THE COURT: -- we are in the middle of a bench trial. So first thing is, at this point, there's no possibility of having a jury trial in the middle of this trial.

[MMG]: I still would like one.

THE COURT: Mr. Hille I believe did a good job of representing you on the first day. Do you have any legal training?

[MMG]: Well, I would walk in here on my trial date with pieces of paper and evidence, if that's what you are asking, if I was representing myself at that point in time.

THE COURT: At this time, your motion to represent yourself and to discharged [sic] your attorney, Mr. Hille, is denied.

[MMG]: Okay.

child.   MMG told Dr. Hernandez that CPS was falsifying drug tests and acting spitefully but she also expressed a desire to be a mother to her child.

The CASA volunteer testified that HMP was doing very well and recommended adoption by Riley, her current placement.   The volunteer believed that termination of MMG's parental rights and adoption by Riley was in HMP's best interests.

A Gonzalez County patrol deputy testified about a mid-morning June 2018 encounter he had with MMG.   MMG was a passenger in CG's truck.   There were multiple open containers in the vehicle.   MMG initiated a physical altercation with the deputy and appeared to be under the influence of something.   The deputy found packets of a substance inside a cigarette package and a used syringe in CG's pocket.   MMG claimed all the potential contraband was hers, including the syringe. The deputy arrested MMG and took her to the local hospital where she was later released with a notice to appear in court at a later date.

DFPS rested.   MMG's counsel was not able to reach her during a trial recess. None of the witnesses MMG had with her on the previous trial date were present. MMG's counsel had no witnesses to call and rested.

The Department sought termination of MMG's parental rights on grounds D, E, N, and O and best interest of the child.[6]   TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N),

---

[6] Subsection 161.001(b)(1)(D) provides that a parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child."   TEX. FAM. CODE ANN. § 161.001(b)(1)(D) (West, Westlaw 2017 through 1st C.S.).

Subsection (B)(1)(E) provides that a parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."   *Id.* at (E).

Subsection (b)(1)(N) provides that a parent:

8

(O).  The trial court made the following oral findings:

> The Court does terminate the rights of [MMG] by clear and convincing evidence pursuant to Texas Family Code, Sections 161.001(b)(1), Subpart D, Subpart E, and Subpart O.   The Court specifically finds that [MMG] has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well being of the child.   And [MMG] has engaged in conduct or knowingly placed the child with persons who engage in conduct which endangers the physical or emotional well being of the child.   Further, the Court finds by clear and convincing evidence that [MMG] has failed to comply with the provisions of a Court order that specifically established the actions necessary for the parent to obtain the return of the child who's been in the permanent or temporary managing conservatorship of the  Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.   Further, the Court finds by clear and convincing evidence that it is in the best interest of the child, [HMP], the rights of her mother [MMG] be terminated today.   The Department of Family and Protective Services is appointed as the permanent managing conservator of the child, [HMP]. [HMP]'s placement is continued in the home of Ms. Riley at this time.

The Order of Termination was entered.   MMG timely filed a notice of appeal through her appointed trial counsel who was granted permission to withdraw.   The trial court appointed appellate counsel for MMG.

---

constructively abandoned the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than six months, and: (i) the department has made reasonable efforts to return the child to the parent; (ii) the parent has not regularly visited or maintained significant contact with the child; and (iii) the parent has demonstrated an inability to provide the child with a safe environment.

*Id.* at (N).

Subsection (b)(1)(O) provides that a parent:
failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

*Id.* at (O).

Shortly after her appointment, appellate counsel moved to withdraw because MMG wished to proceed *pro se*. This Court abated the appeal and requested the trial court hold a hearing on MMG's request to proceed *pro se*. After a hearing at which the trial court heard the motion and questioned MMG, the trial court denied her motion to proceed *pro se*. During the hearing, the trial court questioned MMG and determined that she believed she could file for a change of venue and obtain a new trial. She did not understand that an appeal is designed to determine whether there were mistakes or errors in the trial that occurred. Afterwards, the trial court issued its Findings of Facts which included that MMG has an eighth grade education, but obtained her G.E.D., she has no legal training, has no knowledge of the appellate rules, has no meaningful way to perform legal research to prepare an appellate brief, and her desire to proceed *pro se* "is not made with a full understanding of the dangers and disadvantages of self-representation." The trial court issued Conclusions of Law which included: MMG's decision to proceed *pro se* is done voluntarily, but "is not made knowingly or intelligently," is not in her best interests, "is not in the best interest of the speedy and efficient administration of justice," and that MMG "is not fully aware of the dangers and disadvantages of self-representation."

The appeal was reinstated after the trial court filed the supplemental clerk's and reporter's records.

## II.    *PRO SE* REPRESENTATION

MMG's first complaint is that the trial court erred by denying her motion to represent herself during the termination trial. Counsel argues that like a criminal defendant a parent should have a constitutional right to represent herself based upon the

10

constitutional rights at issue, citing *Faretta v. California*. MMG assumes the right exists and argues that the trial court erred in denying her that right. 422 U.S. 806, 819–20 (1975).

The *Faretta* Court discussed a criminal defendant's right to represent herself and determined the right derived primarily though not exclusively from the Sixth Amendment.[7] U.S. CONST., amend. VI; *Faretta*, 422 U.S. at 819. The two Texas cases that have addressed the right to self-representation in parental termination proceedings rejected the claim. *In re A.H.L., III*, 214 S.W.3d 35, 45, 52 (Tex. App.—El Paso 2006, pet. denied) (concluding due process does not require the right of self-representation in parental termination cases); *see also In re E.A.F.*, 424 S.W.3d 742, 749 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).[8]

In *A.H.L.* the El Paso court "[concluded] that a right of self-representation is not a necessary component of a fair parental rights termination proceeding. And inasmuch as Section 107.013 [of the family code] effectively implements a due process right, a right to self-representation cannot be statutorily implied." 214 S.W.3d at 52. Although the El

---

[7] The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation, who must be confronted with the witnesses against him, and who must be accorded compulsory process for obtaining witnesses in his favor. Although not stated in the Amendment in so many words, the right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment.

*Faretta v. California*, 422 U.S. 806, 819 (1975) (internal citations and quotations omitted).

[8] The father complained in *E.A.F.* that the trial court did not administer *Faretta* warnings when he discharged his court-appointed counsel and proceeded to trial *pro se*. *In re E.A.F.*, 424 S.W.3d 742, 748–49 (Tex. App.-Houston [1st Dist.] 2014, pet. denied).

Paso court's decision is not binding on us, we find its reasoning persuasive. [9] Accordingly, MMG's first issue is overruled.

## III.     INEFFECTIVE ASSISTANCE OF COUNSEL

MMG's second issue asserts that her third court-appointed attorney provided ineffective assistance of counsel based upon his failure to conduct discovery and to secure the attendance of favorable witnesses the second day of trial.

In government-initiated parental rights termination proceedings, indigent parents have a statutory right to counsel until all appeals are exhausted which includes the right to effective assistance of counsel.    *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003).    The *Strickland v. Washington*,[10] standard applies.    *M.S.*, 115 S.W.3d at 545.    MMG must demonstrate that counsel's performance fell below reasonable professional standards and that she was prejudiced.    *See id.*    Prejudice in this context means that counsel's errors were so serious as to deprive MMG of a trial whose results were reliable.    *See id.* MMG must establish both deficient performance and prejudice.    *See id.*

We must determine whether counsel performed in a reasonably effective manner considering all the circumstances and are required to give "great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic."    *Id.* (internal citations omitted)*.*    "In a parental-rights termination case where the parent asserts on appeal the ineffective assistance of trial counsel, but

---

[9] In *A.H.L.*, the litigant also argued that Rule 7 of the rules of civil procedure support a right to self-representation.    MMG did not make that argument.

10  466 U.S. 668 (1984),

12

nothing in the record indicates trial counsel's reasons or strategies for the complained-of conduct, the lack of a record is practically always fatal to the parent's appellate issue." *In re T.N.F.*, 191 S.W.3d 329, 330 (Tex. App.—Waco 2006, no pet.).

Although MMG alleged that counsel failed to conduct discovery, there is no evidence in the record as to counsel's action or inaction. There is also no evidence that discovery would have anything that would have changed or cast doubt on the result. Moreover, any evidence that would have excused MMG's noncompliance with the service plan was within MMG's control.

On the first day of trial, MMG had her brother and niece present who were represented to be alternate placements for HMP and who allegedly had evidence that HMP was mistreated in her current placement. The second day of trial, the caseworker and the CASA volunteer testified regarding the bruise and alleged mistreatment. The bruise was dime-sized. When the CASA volunteer asked HMP about the bruise and mistreatment, the child scoffed. No other bruises were discovered and HMP denied mistreatment.

As to the missing witnesses the second day of trial, the only information before the Court is that MMG's brother and niece, could have been alternate placements for HMP and knew about the bruise. "To obtain relief on an ineffective assistance of counsel claim based on an uncalled witness, the applicant must show that [the witness] had been available to testify and that [the witness's] testimony would have been of some benefit to the defense." *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004); *see Holland v. State*, 761 S.W.2d 307, 319 (Tex. Crim. App. 1988) (stating that "[a]bsent a showing by appellant that he would have benefitted from the testimony, the decision not to call

13

witnesses at either stage of trial does not raise the specter of ineffective assistance."); *see also Ibarra v.* State, No. 13-09-586-CR, 2011 WL 193109, at *10 (Tex. App.—Corpus Christi 2011, no pet.) (mem. op., not designated for publication). Counsel may have determined that MMG's brother and niece had information that was detrimental to MMG as well as potential information that was favorable.

As part of the prejudice inquiry we note that the Department presented substantial evidence that MMG's ability to manage herself was limited and the trial court observed MMG while she was in court. There was evidence that MMG neglected HMP before HMP was removed, and that MMG continued to abuse drugs and alcohol, which was evidence of endangering and neglectful conduct. In addition, there was substantial evidence that MMG did not comply with the requirements of her service plan.

MMG bears the burden to establish both deficient performance and prejudice. The record does not support her claim. MMG's second issue is overruled.

## IV. CONCLUSION

We affirm the judgment of the trial court.

GINA M. BENAVIDES,
Justice

Delivered and filed the
8th day of November, 2018.

14